## HANSON–VAN WINKLE–MUNNING CO. v. UNITED STATES GALVANIZING & PLATING EQUIPMENT CORPORATION.

### No. 1002.

District Court, N. D. West Virginia.

July 27, 1938.

Toulmin & Toulmin, of Dayton, Ohio, · Steptoe & Johnson and James M. Guiher, all of Clarksburg, W. Va., and D. H. Hill Arnold, of Elkins, W. Va., for plaintiff.

Edwards, Bower & Pool, of New York City, and Robinson & Stump, of Clarksburg, W. Va., for defendant.

BAKER, District Judge.

This suit is by Hanson-Van Winkle-Munning Company, a corporation, of New Jersey, with its principal office and place of business at Matawan, New Jersey, against U. S. Galvanizing & Plating Equipment Corporation, a corporation, of the State of West Virginia, and having a place of manufacture in Brooklyn, New York. Both plaintiff and defendant are manufacturers of full automatic plating equipment machines, and are in active competition with one another.

The plaintiff sold a full automatic plating machine to Revere Copper & Brass, Inc., of Rome, New York; the defendant having attempted to sell its machine to the same customer but losing out in competition with the plaintiff. It developed in the trial of this case that it is customary for a seller, in selling a full automatic plating machine, to include in the contract of sale a guarantee against infringement. It is also customary in selling such machines, which are very large and have to be built and assembled in the customer's plant, to show and demonstrate the machine in one's customer's plant to a prospective customer for installation in his plant. Therefore, it becomes important that when a machine is to be demonstrated ·there be no charge of infringement which would disturb the sale to the next customer.

The defendant, upon losing the order for the machine bought by Revere Copper & Brass, Inc., sent a letter notifying the plaintiff of infringement of Patent No. 1,959,799, which had thirty-eight (38) claims. It sent a copy of that notice of infringement to the plaintiff's customer, Revere Copper & Brass, Inc., and the latter called upon the plaintiff to make good upon its guarantee and to protect it from any such charge of infringement. The plaintiff called the defendant's attention to plaintiff's own prior patents, under which it made the Rome machine, which were of earlier date than that of the defendant's patent under which it had been notified. Thereafter, after a lapse of

sometime the defendant notified the plaintiff and its customer, Revere Copper & Brass, Inc., of infringement of another of its patents, No. 1,475,198, which had some twenty-three (23) claims.

The plaintiff called upon the defendant to state which one of the twenty-three (23) claims was infringed, to which the defendant replied that it was unable to do so unless drawings, illustrating the machine it claimed to be an infringement, were supplied to it by the plaintiff. This controversy about the alleged infringement of the plaintiff's machine at Rome, at the plant of its customer, involved the question of the infringement and validity of these two patents of the defendant. Thereupon, the plaintiff herein filed an action in this Court on the ground of diversity of citizenship and more than $3,000, exclusive of interest and costs being involved, to restrain the defendant from suing its customer and from committing acts of unfair competition by sending notices in bad faith as to the alleged infringement, which, as claimed by the plaintiff, it had no sound reasons to send because it admitted that it did not know of the construction of the plaintiff's machine at Rome upon which the charges of infringement were based. Furthermore, this suit was brought under the Declaratory Judgment Act of the United States, 28 U.S.C.A. § 400, on the ground that there was a controversy as to the infringement and validity of its patents.

It sought the jurisdiction of this Court, in which the defendant was a resident, being a corporation of the State of West Virginia, and asked this Court to restrain the defendant from these unfair competitive acts and to determine the basis of these charges to see whether they were well-founded or not. The plaintiff also sought damages for this allegedly unfair conduct of the defendant.

Thereupon, the defendant accepted the jurisdiction of this Court and from time to time secured stipulations for extension of time for answer during the fall of 1935, this suit having been filed on the 23rd day of September, 1935. While awaiting defendant's answer, plaintiff was advised by representatives of the defendant that it intended to ignore the action of this Court and would proceed to file a Bill of Complaint for infringement of patents in suit

against plaintiff's customer, Revere Copper & Brass, Inc., of Rome, New York. Thereupon, the plaintiff herein made a motion to restrain such action, which was set down for hearing thirty days hence to give the defendant opportunity to present any affidavits and to give this Court an opportunity to hear the parties. Three days before this Court reached the case for hearing on the motion for preliminary injunction, the defendant actually did file said Bill of Complaint in the Northern District of New York for the Eastern Division. When this cause came on for hearing these facts being revealed to the Court, it ordered this defendant to dismiss said suit and to cease any further unfair acts and to respect the jurisdiction of this Court. This action by the defendant came close to contempt and, at the very least, was disrespectful of the procedure and jurisdiction of this Court. Thereupon, this Court set this case down for immediate hearing, which was had at the earliest practical moment. At that time the defendant made a motion to dismiss this case for lack of jurisdiction of the Court, particularly on the ground that there was no actual controversy which was cognizant under the Federal Declaratory Judgment Act. This motion was denied. Thereafter, it filed its answer and entered into this Court by way of counterclaim, charging the plaintiff with infringement of its patents and averring that the patents were valid. The plaintiff replied setting up noninfringement and invalidity by way of prior art, prior publications, and prior uses of the patents in suit. At the trial the defendant renewed its motion to dismiss the case on the above grounds, despite the fact that it had already accepted the jurisdiction of this Court by filing its counterclaim. Prior to the trial, the defendant elected to rely upon seven out of the sixty-one claims in the two patents.

On the issue of unfair competition this Court finds the following:

(a) The several notices of patent infringement sent to the plaintiff had copies thereof sent by the defendant to the plaintiff's customer. No suit followed these charges of infringement to show good faith in sending the notices. The notices were spaced apart at an appreciable period in order to continue the pressure upon the plaintiff's customer. When the plaintiff

asked the defendant to specify what claims it charged were infringed, defendant claimed it could not do so without having drawings of the machine furnished by the plaintiff to its customer.

This, on its face, showed bad faith and that charges of infringement were made without adequate investigation of the facts.

(b) Furthermore, after this case was ready for trial defendant did specify 7 claims out of the 61 claims in the two patents, showing that it did have the information to specify these claims and could have done so when requested so to do by the plaintiff. This, again, was bad faith. More important still, at the trial it developed that defendant's executives had seen the plaintiff's machine in Rome in operation, prior to sending the notices and had the fullest opportunity to determine the questions of infringement, and that the statements in their letters to the contrary were untrue. This, again, was bad faith. After this suit was brought and these issues were left to the determination of this Court, defendant did not seek immediately to try out the question of the jurisdiction of this Court. It waited until a motion for preliminary injunction came on for hearing. It continued its threatening attitude after this suit was brought and three days before the preliminary injunction motion was to be heard to restrain these threats, it did actually file the suit at Rome, which was an act of bad faith and unfair competition against the plaintiff, and certainly was disrespectful of the jurisdiction and process of this Court and substantial contempt thereof. This is mentioned as indicative of the determined course of this defendant to commit its acts of unfair competition by trying out these matters in the trade, rather than in a court of law.

(c) At the trial of this case it developed from the testimony of Attorney F. A. Bower, counsel for defendant, who was also acting as a witness, that a probable prior use and prior offer to sell had taken place by the defendant with respect to its first patent, No. 1,475,198. Upon motion of the plaintiff this Court ordered the records of the defendant produced. As hereinafter found, these records showed a prior offer to sell and a prior use on the part of the defendant, known only to it and to its potential customer, The Standard Parts Company of Cleveland, Ohio, at a time more than three years prior to the date of the filing of application for Letters Patent, which matured into Patent No. 1,475,198. It also developed from these records that Louis Potthoff was not the inventor of the invention covered by said patent, but that his employee, Schweinsberg, who later received Patent No. 1,428,-563, was the inventor because he was the first one to produce a written dated disclosure to the attorneys for the defendant. This paper was found in the records of the defendant. Therefore, the Court finds this to be another act of bad faith because this defendant knew from its own records that this patent was invalid when it charged infringement of the patent.

Again, the record now develops that a succession of priority was filed by Louis Potthoff, with respect to the Schweinsberg Patent No. 1,428,563, when the application of Louis Potthoff, maturing into Patent No. 1,475,198, was in interference with the Schweinsberg application. Here again is another evidence of a record, which would normally be unknown to this plaintiff when the charge of infringement was made against it and its customer.

(d) This Court finds that these various acts were injurious and unfairly competitive to plaintiff, and these notices were sent in bad faith to the plaintiff and its customer. It should be permanently enjoined for such unfair competition, which is damaging to the plaintiff. The plaintiff promptly sought the relief of this Court in the defendant's home jurisdiction. It has been put to great expense, time, trouble, and annoyance in determining this matter. Its attitude has been fair and candid, while the defendant's attitude does not entitle it to relief of any sort, as it comes into this Court with unclean hands. Its conduct is enough to deny it, on that ground alone, the relief it seeks affirmatively under its counterclaim. However, in order to dispose of the entire case, this Court makes the following findings on the merits of the counterclaim.

Validity of Potthoff, No. 1,475,198.

This Court finds that the nature of this patent is this:

Mechanically, it consists of a series of tanks arranged one after the other; an endless conveyor comprising a pair of separated chains arranged in pairs over each tank is provided with fingers for

moving rolling tire rims along tracks submerged in solutions in each tank. Anodes and cathodes connected to generators are submerged in the solution to electrify it. The entire solution is electrified. The solution consists of a caustic alkali to clean the articles, and copper cyanide or other similar salt to give the articles a plating of copper or other metal. As the caustic soda acts more quickly than the plating operation, the articles are first cleaned and then plated in the same solution as they are moved through it by the chains and the fingers on the chains. Claims 5, 9, 19 and 20 deal with the chemical treatment. Claim 21 deals with the arrangement of the electrical apparatus by which the generators are so arranged to be connected by switches to the anodes and cathodes so that either a greater or lesser voltage may be selectively applied. Claim 21 specifically disclaims such an arrangement if there is any rheostat in the electrical circuit.

Defendant in its brief seeks to limit its chemical claims to the articles first being chemically treated and thereafter, when they near the end of the tank where the anodes and cathodes are located, the articles are electrified. I find no such limitation, as a matter of fact, in the claims, which are broadly for a solution that performs simultaneously the cleaning and plating operation. If, however, the defendant is right in its contention, then there is no infringement of its chemical claims because the plaintiff in its machine has its anodes and cathodes arranged evenly from end to end of the tank and not in one end only, so that the electrification of the solution and the articles in it, according to defendant's theory, would take place almost immediately upon the introduction of the articles into plaintiff's tank at Rome. For this reason there would be no infringement, as a matter of fact, by the plaintiff's Rome machine.

While the issue of validity of the claims on the mechanism is not before the Court upon the counterclaim, yet it is of interest to the Court on the lack of a probable cause for sending the notice of infringement to the plaintiff and its customer.

The Court finds that the prior art patents, such as Potthoff patent No. 786,776 of 1905; Potthoff patent No. 866,959 of 1907; and Schweinsberg patent No. 1,428,563 of 1919, amongst which are several of the defendant's own prior art patents,

show that all of the mechanical apparatus involved herein is old and has been for many years, which apparatus was particularly well known to the defendant when it sent the notices, because its own patents showed this antiquity.

■ On the subject of the chemical claims 5, 9, 19 and 20 in issue, I find these claims are fully and completely met by the following patents and publications, which show that combined cleaning and electro-plating, or combined cleaning, electro-cleaning and electroplating, or combined electro-cleaning and electroplating in the same solution in the same tank, is old and has been used for many years prior to the date of application of patent No. 1,475,198, such patents and publications being the following: Levy patent No. 923,864 of 1908; American Electro-chemical Society publication of April, 1915 (Exhibit No. 11); Langbein's "Electro-Deposition of Metals" of 1913, 7th edition (Exhibits 11 and 23); Bedell on "Practical Electro-Plating," 1916 (Exhibits 11 and 24); Ramage patent No. 567,612 of 1896; Schweinsberg patent No. 1,428,563; Howard patent No. 949,575 of 1910; British patent No. 25,553 of 1907; and British patent No. 4,877 of 1881.

I further find that the practice of placing articles to be plated in a tank in a single solution which is capable of both cleaning and plating and by which the articles are first placed in the solution and then later electrified to electroplate them when the current is turned on, is an old practice shown by the following patents: Wright patent No. 106,977 of 1870; Smith et al. patent No. 585,051 of 1897; Goodrich patent No. 635,380 of 1899; Wicks patent No. 637,313 of 1899; DeLong patent No. 887,776 of 1908; Lutz patent No. 1,022,487 of 1912; Laughlin patent No. 1,208,584; Broderick patent No. 858,059 of 1907; Davoran patent No. 1,318,053; Sealey patent No. 1,181,349; Miller No. 1,321,936.

I further find that these patents are but the expression of what would be expected to be the natural action of a mechanic in plating articles, and these claims are invalid for lack of invention.

On the validity of the electrical apparatus claim 21, this Court finds that apparatus for generating current for electroplating apparatus employing a three-wire

system in which switches were used to apply different voltages from the same generators is an old practice.

The subject matter of claim 21 is also shown and described in Bedell's "Practical Electro-Plating, Fourth Edition," pages 209–213; the "Standard Handbook for Electrical Engineers" of 1915, pages 620, 623; and in "Electro-Deposition of Metals," by Langbein, pages 180–182.

The plaintiff has been manufacturing and selling three-wire generators for this purpose since 1911, as shown by its drawings of 1911, 1918 and 1920 (Exhibit 41). This is further shown by the catalog of its predecessor, the Munning and Loeb Company, Catalog No. 100 of 1918 (Exhibits 11, 21, 36). To the same effect is the Hanson & Van Winkle catalog of 1912, page 50 (Exhibits 11, 38).

### Infringement of Potthoff, No. 1,475,198.

The Court finds that, while claim 21 on the electrical apparatus of patent No. 1,475,198, disclaims rheostats in any of the electrical circuits, yet defendant has such rheostats, and the defendant so admits. The defendant states, however, that the rheostats are only in the field circuits of the generators of the Rome machine of the plaintiff, but the claim is not so limited as it is primarily drawn to disclaim any rheostats in any electrical circuit associated with the system. This Court finds that the plaintiff's machine has such rheostats and, therefore, the claim is not infringed, as a matter of fact.

As to the chemical claims 5, 9, 19 and 20, this Court finds the following:

(a) Plaintiff's machine at Rome, as originally built, was so arranged that the work pieces on their carriers are immersed prior to the carrier engaging the cathode rail (Plaintiff's Ex. 72). This Exhibit shows, and the testimony of the witnesses proved, that the work piece when so immersed in the electrolyte that was in circuit with the positive anode and the negative cathode became electrified as an intermediate electrode. Defendant's expert witness, Dr. Mantell, admitted this fact. He only disagreed as to the amount of electrification. The claims are not limited to the degree of electrification. Later, in order to demonstrate that it made no difference in plating results, the plaintiff changed its machine so that the carrier

carrying the work pieces was electrified immediately upon the work pieces entering the solution by engaging the contact rail (Ex. 50). This difference is brought about by the location in the guide rail of the insulation strip that supports the guide rail over one tank from another in such a position that the carrier is electrified by the cathode rail as in Ex. 50. The witnesses, Drs. Graham, Hogaboom, and Guerin Todd, testified as to comparative tests before and after this change, and produced work pieces produced on the Rome machine before and after the change. This Court finds this testimony and these exhibits show that there was no difference in results or in current flow. The Court also finds that the anodes and cathodes in the plaintiff's machine are located equidistantly throughout the length of the tank, and there is no infringement of the claims 5, 9, 19 and 20, according to the defendant's theory that there is electrification only at one end of the tank because the anodes and cathodes, as shown in its patent, are at one end of the tank only. I further find that there is no preliminary chemical cleaning without electrification in the plaintiff's machine and, therefore, for that reason alone, the claims are not infringed because the defendant has limited the claims to first bringing about chemical cleaning and then electro-chemical cleaning and then electroplating. The Court finds that the work pieces in defendant's machine are electrified as soon as they enter the solution, and there is no preliminary cleaning without electrification in plaintiff's machine at Rome so that there is no infringement.

### Patent No. 1,959,799.

1. At the conclusion of the defendant's argument on the second day of the argument before this Court, after the previous day had been spent by the plaintiff in discussing patent No. 1,959,799 and claims 34 and 36 thereof, the defendant came into Court and said that it disclaimed claims 34 and 36, which were the only claims remaining that it charged to be an infringement. Thereafter defendant entered a formal disclaimer in the United States Patent Office, as shown by its document of disclaimer recorded in the United States Patent Office on November 17, 1937.

2. This Court finds that the first notice of infringement which started the contro-

versy between the parties was based upon this patent No. 1,959,799, infringement of which is now publicly disclaimed and the subject matter of which has been formally dedicated to the public by the action of the defendant in this Court and in the United States Patent Office after a long and expensive trial involving this patent. A copy of this first notice based upon patent No. 1,959,799 of the defendant was sent to the plaintiff's customer, Revere Copper & Brass Company, Inc. When defendant made this claim of infringement of this patent, the plaintiff wrote the defendant and set forth the two patents of its own of earlier date under which it had built its machine supplied to its customer, Revere Copper & Brass Company, Inc., which showed that the patent No. 1,959,799 was invalid, or if not invalid, the Rome machine did not infringe. Despite this fact and this candid statement by the plaintiff of its position and its defense, the defendant persisted in its threats of infringement so that this plaintiff, which did not know what claims were charged to be infringed, sought the aid of this Court to determine the question of validity of this patent and of infringement. While this cause was pending in this Court, this defendant again became active in its threats to bring a suit on patent No. 1,959,799 against plaintiff's customer, Revere Copper & Brass Company in the United States District Court for the Northern District of New York. The plaintiff moved for a preliminary injunction to restrain such action and in defiance of this Court's jurisdiction, three days before the preliminary injunction was heard, this defendant brought suit on this patent in the United States District Court for the Northern District of New York against the Revere Copper & Brass Company, Inc. and the plaintiff. After this Court compelled dismissal of this suit, this cause was heard at the main hearing and upon the supplementary hearing. It was thereafter elaborately briefed, during all of which time the defendant vigorously relied upon this patent No. 1,959,799 through its counterclaim, and particularly upon claims 34 and 36. It then appeared in this Court some months later and after the conclusion of the argument of the plaintiff on patent No. 1,959,799, and in the midst of its own argument, it handed up proposed findings of fact and conclusions of law involving patent No. 1,959,799, asking this Court to find that claims 34 and 36 were good and valid. On the morning of the second day of the argument at the conclusion of defendant's argument, its counsel arose and disclaimed any claim upon this patent and in particular as to claims 34 and 36.

It thereafter filed a formal disclaimer in the United States Patent Office as to claims 34 and 36 which was recorded on the 17th day of November, 1937, cancelling them from its patent. This Court finds that all of the defenses which compelled such a disclaimer were known in essence when the plaintiff informed the defendant on the 16th day of July, 1935, of its own two prior patents under which it built the Rome machine. Shortly thereafter the bill of complaint advised the defendant of numerous additional reasons why this patent was invalid. This Court finds that the conduct of the defendant in persisting until the last moment on this patent and in its charges against plaintiff and its customer, Revere Copper & Brass Company, Inc., was willful and in bad faith and in disrespect of this Court's reasonable convenience. The defendant's conduct was not in good faith with this Court nor in good faith with the plaintiff because it should have easily arrived at this conclusion of the invalidity of its claims when it received the candid reply from the plaintiff as to the reasons why the claims were invalid in response to the notice of infringement under this patent sent by the defendant. Furthermore, the defendant is presumed to have known as a matter of law of these prior patents and defenses and despite this presumption persisted in these threats of infringement against plaintiff and its customer. All of this in the judgment of the Court shows bad faith.

3. In order that a complete record may be made in this Court, the Court has set forth its reasons why these claims are invalid in order to show the foundation for this Court's finding of fact that the claims were invalid, must have been known to be invalid as a matter of law by the defendant, and therefore the action of the defendant was in bad faith.

1. This Court concludes (a) that the conduct of the defendant as now confirmed by its disclaimer was in bad faith in notifying plaintiff and its customer of infringe-

ment of patent No. 1,959,799; (b) in persisting in charging this infringement before and after the trial; (c) in bringing suit under this patent against the plaintiff and its customer; and (d) in trying this case by way of counterclaim under this patent against the plaintiff and then admitting at the last moment that the claims were invalid after this long and persistent litigation had uselessly taken place when there was no change in the facts to bring this about.

2. The Court concludes, as a matter of law, that when a party disclaims the claims of a patent on which it is suing (the defendant here is suing on patent No. 1,959,799 under its counterclaim), it must pay all the costs, and I further conclude that the defendant in this case must pay all the costs of this litigation for this as well as other reasons, and I refer the question of the assessment of these special costs to Earle L. Maxwell, Esquire, Elkins, West Virginia, as a Special Master in Chancery to determine this question and to also determine the question of the damages to the plaintiff by reason of the defendant's conduct as found herein. The question of costs under a disclaimer is settled by the following: R.S. § 4922, U. S.C., Title 35, § 71, 35 U.S.C.A. § 71; R.S. § 973, U.S.C., Title 28, § 821, 28 U.S. C.A. § 821; O'Reilly v. Morse, 15 How. 62, 14 L.Ed. 601; Yale Lock Mfg. Co. v. Sargent, 117 U.S. 536, 6 S.Ct. 934, 29 L.Ed. 954; Metallic Extraction Co. v. Brown, 8 Cir., 110 F. 665; Novelty Glass Mfg. Co. v. Brookfield, 3 Cir., 172 F. 221; Liquid Carbonic Co. v. Gilchrist Co., 7 Cir., 253 F. 54; Houser v. Starr, 6 Cir., 203 F. 264; Fox Typewriter Co. v. Corona Typewriter Co., 6 Cir., 282 F. 502.

3. I further conclude that initially as to both patents in suit the defendant charged infringement of the claims of both patents without limitation, and that later it successively reduced its claims relied upon in the two patents until now it only relies upon claims 5, 9, 19, 20 and 21 of patent No. 1,475,198. As a matter of law this shows bad faith and I conclude that the defendant should be enjoined from ever prosecuting this plaintiff under any of the claims of either patent in view of its bad faith in charging infringement of the plaintiff and its customer in this instance. The presumption of validity of the whole patent, No. 1,959,799, is lost by the disclaimer.