## UNITED STATES GALVANIZING & PLATING EQUIPMENT CORPORATION v. HANSON–VAN WINKLE–MUNNING CO.
### No. 4429.

Circuit Court of Appeals, Fourth Circuit.
June 12, 1939.

Clifton V. Edwards, of New York City, and John S. Stump, Jr., of Clarksburg, W. Va. (Frank A. Bower, of New York City, on the brief), for appellant.

H. A. Toulmin, Jr., of Washington, D. C. (Steptoe & Johnson, of Clarksburg, W. Va., Toulmin & Toulmin, of Washington, D. C., D. H. Hill Arnold, of Elkins, W. Va., James Guiher, of Clarksburg, W. Va., and H. A. Toulmin, of Washington, D. C., on the brief), for appellee.

Before PARKER, NORTHCOTT and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in a suit involving patent infringement and unfair competition in the claiming of such infringement. The plaintiff is the Hanson-Van Winkle-Munning Company, a manufacturer of electroplating apparatus, which in the year 1935 sold and installed an electroplating machine for Revere Copper & Brass, Inc., of Rome, N. Y. Shortly after this machine was installed, both plaintiff and its customer received letters from counsel of defendant, the United States Galvanizing & Plating Equipment Corporation, notifying them that the machine so constructed constituted an infringement of patents Nos. 1,475,198 and 1,959,799 owned by the defendant. Plaintiff thereupon instituted this suit asking that the patents relied on by defendant be held invalid and not infringed by the

machines of plaintiff's manufacture .and that defendant be enjoined from suing or threatening to sue plaintiff or its customers for infringement thereof or giving to plaintiff's customers further notices of infringement. Defendant filed answer admitting the sending of the notices but denying that they constituted unfair competition. By way of counterclaim it pleaded ownership of the patents, alleged infringement thereof by plaintiff and asked an injunction and accounting because of such infringement.

When the case came on for hearing, defendant specified claims 5, 9, 19, 20 and 21 of patent No. 1,475,198 and claims 34 and 36 of patent No. 1,959,799 as the claims infringed by plaintiff. At the conclusion of the hearing, it withdrew all contention with respect to the two claims of the second patent and gave notice that it was filing a disclaimer as to them in the Patent Office. The claims specified from the other patent were held not infringed and invalid. Decree was thereupon entered holding that both patents were invalid and not infringed by machines of plaintiff's manufacture and that the notices of infringement had been given by defendant in bad .faith .and constituted unfair competition. Injunction was granted restraining defendant from suing plaintiff or its customers for infringing either of the patents or from sending them letters or notices claiming infringement thereof; and the cause was referred to a master to report as to costs incurred by plaintiff as a result of the litigation including attorney's fees, loss of profits and damages. For opinion below see Hanson-Van Winkle-Munning Co. v. U. S. Galvanizing & Plating Equipment Corporation, D.C., 24 F.Supp. 249. Defendant has appealed and four questions are presented for our consideration: (1) whether claims 5, 9, 19, 20 and 21 of patent No. 1,475,198 are valid and infringed by plaintiff; (2) whether plaintiff is entitled to relief in this suit under the Declaratory Judgment Act; (3) whether the evidence warrants the granting of relief on the ground of unfair competition; and (4) the scope of the decree to be entered.

■ The patent in suit, No. 1,475,198, covers a device for cleaning and electroplating metallic articles. Its distinguishing characteristic is that, in a tank containing a mixture of chemicals designed for cleaning and a cyanide of the metal to be used in plating, it submerges the articles to be plated and, when it has carried them part of the way through the mixture, causes an electric current to flow through it in such way as to deposit on the articles, which are in contact with the cathode of the electric circuit, a plating of the metal which is in solution. Its action is thus described in the specification: "When the combined cleaning and plating operations are to be carried on in this tank the supporting means for the articles are provided .with current conducting means in contact with the articles and serving to collect electroplating current from the articles as they pass through the solution. * * * The following ingredients have been found efficient in action to produce a preliminary cleaning and a copper strike: caustic soda six parts, soda ash six parts, aluminum silicate one part, sodium cyanide one part, copper cyanide one part to one hundred and twenty-eight parts of water. The temperature of the solution may be varied to control the speed of the operation, the same effect being obtained in one minute at a temperature of 180 degrees F. that is. obtained . in six minutes at a temperature of 50 degrees F. With these various ingredients and the electroplating at the discharge end of the tank the article is first thoroughly cleaned and then immediately plated. The caustic soda acts as a cleaner on the steel and the soda ash acts directly on the grease while the aluminum silicate prevents the conversion of the soda and greases into a soap. At the same time the three ingredients offer an ideal combination for the generation of gas by which means the inert material is thrown off leaving a chemically clean surface. On this surface there is immediately secured a deposit of the metal carried in the solution which in the above example is copper."

There are twenty-three claims in the patent, most of which relate to the apparatus. None of the apparatus claims is relied on by defendant except claim 21, which relates to means for varying without use of rheostats the electric current supplied to the various tanks of the machine. The other claims relied on are process claims and are as follows:

"5. The process of cleaning and electroplating, comprising treating an article with an alkali cleaning solution and then electroplating the article without removing it from the cleaning solution."

"9. The process of cleaning and plating which comprises cleaning the article in an alkali solution. containing a cyanide

of the metal to be deposited and then electroplating the article without removing it from the cleaning solution."

"19. The process of cleaning and electroplating, comprising immersing an article in a solution containing cleaning ingredients and a salt of the metal to be deposited, then after the article has been immersed for a certain length of time passing an electric current through said article while in the solution to electrically clean the surface and immediately secure the deposition of the coating on the clean surface.

"20. The process of cleaning an article preparatory to electroplating it, comprising immersing the article in a cleaning solution and after the article has been immersed in the solution for a certain length of time passing electric current through the article to further clean the surface thereof."

Defendant relies on these process claims as covering two separate processes: (a) A combined process of cleaning and plating in one tank with one solution without removing the article from the solution. (b) The process of immersing the article in such a solution so that it is chemically cleaned without electric current and thereafter turning on the current and electrically cleaning the article and electroplating it. Whether there was novelty in the mechanism designed for applying the process, we need not stop to inquire, as claims involving the mechanism are not before us. Defendant has seen fit to rest its case upon the process claims quoted (except as to claim 21 which we shall discuss hereafter); and these claims are clearly void because all of them are so broadly drawn as to include processes old in the art.

Levy patent No. 923,864 of 1909 discloses very clearly the chemical and electrochemical cleaning of articles to be plated and the plating of them in one bath or mixture, the specification thereof containing the following description of the process:

"The following is a description of the process: The metal articles are used as a cathode in a bath made of a concentrated solution of an alkaline substance, soda, potash and the like with a slight addition of an alkaline cyanid, and at the same time an anode is employed, made of the metal or alloy intended to be deposited. The latter ingredient added to the bath may vary according to the nature of the material to form the deposit. For instance, for cop-pering excellent results have been found from the use of a quantity of cyanid corresponding to one tenth of the alkaline salt used. In place of cyanids other alkaline salts may be used as additions to the alkaline solution, such as chlorids or iodids and the like. In these cases however a suitable solvent, such as alkaline sulfites or hyposulfites, must also be added to the electrolytes. These latter ingredients may also be added jointly with cyanids as addition to the alkaline substance. The same result may likewise be obtained when an alkaline phosphate or pyrophosphate is used with or without an addition of alkaline sulfites or hyposulfites as addition to the alkaline solution. The passage of the current through such an electrolyte effects, in the first place, the complete removal of grease from the metal articles serving as the cathode and at the same time, owing to the attack of the anode, results in the formation of the necessary electrolyte for the subsequent metallic deposit on these articles. Therefore, this bath must be under current for some time before it supplies satisfactory deposits; nevertheless the result may be obtained immediately if instead of the whole or part of the alkaline cyanid a like quantity of the corresponding metallic cyanid, metallic chlorid, iodid, and the like, metallic phosphates and pyrophosphates are used. The same substitution of the corresponding metallic salt can be made when using a chlorid, iodid, and the like, a phosphate or a pyrophosphate, as already mentioned.

"The process described has the advantage that the cleaning of the articles and the galvanic deposit takes place successively in one and the same bath, and besides that the formation of the metallic salts required for the deposit takes place in the bath itself when the metal anode is used, and thus does away with the necessity of using the very expensive pure metal salts for producing the electrolytes."

See also Britsh patent to Levy No. 25,-553, issued in the year 1907.

In a paper read at a meeting of the American Electro-Chemical Society in joint session with the American Electro-Platers Society, at Philadelphia, in April 1915, Mr. Oliver P. Watts set forth the process as follows (p. 141): "For a number of years past the electric current has been extensively used for removing grease and dirt from metallic metals after polishing, and as a preliminary to electro-plating. From

this use of the electric current for the successive operations of cleaning and plating metals, it was but a short step, in thought at least, to combine the two operations, and perform the cleaning and plating simultaneously in a single solution. Since its inception seven or eight years ago, this process has been steadily increasing in favor among platers until today it is very widely practiced. Although the combined cleaning and plating solution is sometimes employed to produce the final deposit, its most frequent use is for giving to iron and steel a preliminary coating of copper before nickeling. For this latter purpose it possesses great advantages over the use of two separate solutions. Not only is there a saving of the time and labor required to transfer the articles from one solution to the other, but any failure to remove the grease is detected while the object is still in the cleaning solution, by the failure of the copper to completely cover the iron."

There can be no question that a combined cleaning and electroplating solution was old in the art. See Watt & Philip Electro-Plating and Electro-Refining, 1902, pp. 154, 155, 156; Langbein's Electro-Deposition of Metals, 7th Ed., 1913, p. 328; Bedell Practical Electro-Plating, 1916, p. 127. And the practice of placing articles to be plated in a tank containing an electrolyte or plating solution and then electrifying them was an old practice. See Wright patent No. 106,977 of 1870; Smith patent No. 585,051 of 1897; Goodrich patent No. 635,380 of 1899; DeLong patent No. 887,776 of 1908; Lutz patent No. 1,022,487 of 1912; Miller patent No. 1,321,936 of 1919. It involved, of course, no invention to use the old combined cleaning and plating solution as the electrolyte with the old process of placing the articles in the solution before applying the electric current to them.

Claim 21 of the patent relied on is as follows: "21. In electroplating apparatus, the combination with a plurality of tanks, of means for supporting articles in said tanks in contact with the cathode terminals, anodes in said tanks, and means for supplying electric current to the articles in said tanks comprising a three wire system whereby the current in each of said tanks may be widely varied without rheostat resistance in the electric circuits."

The use of three wire generators for supplying current of different intensity to the different tanks of an electroplating machine was old in the art, as pointed out in the opinion below. It involved nothing more than mere mechanical skill in any event. Furthermore, infringement could not be predicated of plaintiff's machine since it used rheostats in the field circuits.

It is clear, therefore, that as all of the claims relied on by defendant are void, it cannot prevail on its counterclaim and we are brought to the question as to whether plaintiff is entitled to relief in its prayer for declaratory judgment. We think that it is. A real controversy admitting of judicial determination existed between plaintiff and defendant as to whether the machine which it had manufactured at Rome for its customer constituted an infringement of the two patents relied on by defendant, and as to whether defendant was violating rights of plaintiff in giving notices of infringement to its customers. It was to meet just such a situation that the declaratory judgment statute was enacted. That statute, 28 U.S.C.A. § 400, provides: "(1) In cases of actual controversy except with respect to Federal taxes the courts of the United States shall have power upon petition, declaration, complaint, or other appropriate pleadings to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed, and such declaration shall have the force and effect of a final judgment or decree and be reviewable as such."

As said by the Supreme Court in Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617, 108 A.L.R. 1000: "A 'controversy' in this sense must be one that is appropriate for judicial determination. Osborn v. United States Bank, 9 Wheat. 738, 819, 6 L.Ed. 204. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. United States v. Alaska S. S. Co., 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. * * * Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon

the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages."

See also Stephenson v. Equitable Life Assur. Soc., 4 Cir., 92 F.2d 406; Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 92 F.2d 321; Anderson v. Aetna Life Ins. Co., 4 Cir., 89 F.2d 345.

A case directly in point is E. Edelmann & Co. v. Triple-A Specialty Co., 7 Cir., 88 F.2d 852, 854, where an alleged infringer sued to have the validity of a patent and alleged infringement determined and to have the patentee enjoined in the suit from the publication of charges of infringement. In upholding the right of plaintiff to the relief prayed, the court said: "The Declaratory Judgment Act merely introduced additional remedies. It modified the law only as to procedure and, though the right to such relief has been in some cases inherent, the statute extended greatly the situations under which such relief may be claimed. It was the congressional intent to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued. But the controversy is the same as previously. Heretofore the owner of the patent might sue to enjoin infringement; now the alleged infringer may sue. But the controversy between the parties as to whether a patent is valid, and whether infringement exists is in either instance essentially one arising under the patent laws of the United States. It is of no moment, in the determination of the character of the relief sought, that the suit is brought by the alleged infringer instead of by the owner."

And we think that in such suit, upon the determination of non-infringement, plaintiff is entitled to injunctive relief restraining the defendant from harassing its customers with suits and notices of infringement, a proper basis having been laid in the pleadings and proof for the granting of such relief. The Declaratory Judgment Act provides for the granting of further relief in addition to the declaration of rights wherever necessary or proper. Section 2 thereof, 28 U.S.C.A. § 400(2) provides: "(2) Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application shall be by petition to a court having jurisdiction to grant the relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party, whose rights have been adjudicated by the declaration, to show cause why further relief should not be granted forthwith."

In Stephenson v. Equitable Life Assur. Society, supra, having under consideration a suit for a declaratory judgment in which an insured asked for a declaratory judgment of his rights under a policy of insurance and for the recovery of past due installments under its disability provisions, we said [92 F.2d 410]: "The fact that, in addition to asking judgment declaring the rights of the parties in the premises, plaintiff asked a recovery of the past-due disability installments, does not detract from the power of the court to grant the declaratory relief. Upon the court's declaring the rights of the insured under the policy in accordance with his contentions, he would have been entitled to recover these installments; and the second paragraph of the act expressly provides for the granting of further relief whenever necessary or proper."

Upon the adjudication that the machine built by plaintiff did not infringe the patents of defendant, and upon the finding, justified by the evidence, that defendant had been sending notices of infringement to plaintiff's customers and threatening further litigation under the patent, plaintiff was entitled to an injunction restraining defendant from instituting such suits or sending such notices. E. Edelmann Co. v. Triple-A Specialty Co., supra; Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065; General Chemical Co. v. Standard Wholesale Phosphate & Acid Works, 4 Cir., 101 F.2d 178.

We do not think, however, that plaintiff has shown facts entitling it to relief on the ground of unfair competition. The evidence shows merely the sending of a notice to plaintiff and its customer in July 1935 claiming infringement of one of the patents relied on by defendant and the sending of a notice to them in the following September claiming infringement of the other. Suit was instituted by plaintiff shortly after the sending of the last notice; and no other notices are shown to have been sent or any other conduct of a harassing nature engaged in by defendant prior to the institution of suit. Plaintiff contends that at the time of sending these notices defendant had in its files proof that the patent was

862

invalid because of prior use of the patented device and of the offering of it for sale. Defendant denies that prior use was established or that the device of the patent was offered for sale prior to the granting of the patent and contends that at the most the proofs offered show nothing more than an unaccepted offer to build a machine of that character. Without passing upon these contentions in so far as they concern the validity of the patent, we do not think that the evidence offered was of such character as to stamp the conduct of plaintiff with bad faith in insisting upon its validity. Other acts occurring after the institution of suit, such as the institution of suit against the customer in New York (see Kelley v. Ypsilanti Dress-Stay Mfg. Co., C.C., 44 F. 19, 10 L.R.A. 686) and the abandonment of claims asserted under patent No. 1,959,-799, have no tendency, we think, to establish bad faith or unfair competition.

■ The giving of notices of infringement, where a patented article is not marked as such, is provided for in the statutes as a prerequisite to the recovery of damages for infringement. 35 U.S.C.A. § 49; American Ornamental Bottle Corp. v. Orange-Crush Co., 4 Cir., 76 F.2d 969, 970. And the giving of one such notice as to each patent alleged to be infringed could hardly be said to be unfair competition, in the absence of unusual circumstances and of clear proof that the one giving it had no faith in his position. The rule is well settled, of course, that the sending of notices of infringement to a manufacturer's customer in bad faith and without intention of bringing suit, but solely to injure the manufacturer's business, constitutes a fraudulent invasion of his rights which a court of equity will enjoin. Adriance, Platt & Co. v. National Harrow Co., 2 Cir., 121 F. 827; Electric Renovator Mfg. Co. v. Vacuum Cleaner Co., C.C., 189 F. 754; A. B. Farquhar Co., Ltd. v. National Harrow Co., 3 Cir., 102 F. 714, 49 L.R.A. 755; Racine Paper Goods Co. v. Dittgen, 7 Cir., 171 F. 631. Here, however, the evidence falls far short of establishing bad faith or intent to harass plaintiff's customers. On the contrary, the reasonable conclusion is that defendant believed that its patents were being infringed and gave notice accordingly. In such case it is well settled that a charge of unfair competition cannot be sustained. Flynn & Emrich Co. v. Federal Trade Comm., 4 Cir., 52 F.2d 836, 838; Heuser v. Federal Trade Comm., 7 Cir., 4 F.2d 632; Kelley v. Ypsilanti

Dress-Stay Mfg. Co., C.C., 44 F. 19, 10 L.R.A. 686; Price-Hollister Co. v. Warford Corporation, D.C., 18 F.2d 129; Warren Featherbone Co. v. Landauer, C.C., 151 F. 130. The language of Judge Anderson in Heuser v. Federal Trade Comm., supra, is appropos here. Said he [4 F.2d 634]: "We think the evidence falls short of establishing the charge of bad faith. Not many letters threatening suit were sent. There was no circularization of the trade, as in many cases. The letters were written and sent by the attorneys of petitioner, attorneys of good standing in their profession, who, upon being informed by petitioner as to his claims, in good faith advised him that his patents were valid, that the persons to whom letters were sent were infringing them, and they further advised delay in bringing suits. Two suits were actually brought against parties to whom letters were sent. True, these suits were not filed until after the proceedings by the respondent were begun; but this fact is not, in the light of the circumstances, and the presumptions that run with human conduct, sufficient to establish bad faith."

■ Coming then to the scope of the decree, we think that it was properly held therein that claims 5, 9, 19, 20 and 21 of patent No. 1,475,198 were invalid and that neither patent No. 1,475,189 nor patent No. 1,959,799 was infringed by the machine which plaintiff had built at Rome, New York, and that injunction was properly granted restraining defendant from sending notices of infringement or instituting suits to establish infringement with respect thereto. We are not impressed with defendant's contention that only the claims above mentioned were in suit. Plaintiff was entitled to an adjudication as to whether the machine which it had built infringed either of the patents which defendant was claiming to be infringed, in the light of all their claims; and defendant could not escape a final adjudication on this question by specifying certain claims as being relied on. Such specification estopped defendant from claiming infringement with respect to other claims; and upon a finding that the claims specified were invalid a general finding that neither patent was infringed was justified. This, however, did not justify a finding that either patent was generally invalid. It may be that claims other than those adjudicated are valid and that constructions and processes other than those before the court might infringe them.

The decree should be limited to finding that the specified claims are invalid and that the patents in suit are not infringed by the machine built at Rome or the processes used in connection therewith, and to enjoining the defendant from giving notices or bringing suit with respect to said machine or similar machines built by plaintiff. The decree appealed from should be modified, therefore, so as to eliminate therefrom the findings as to unfair competition, the holding that plaintiff is entitled to recover damages on account thereof and the order referring the case to a master to determine such damages; and the case will be remanded with direction to enter a decree as above indicated taxing the costs against defendant as in ordinary suits in equity without allowance of counsel fees or other special damages. The costs on this appeal will be divided; but the cost of printing the appendix to brief of appellant will not be taxed as costs, since appellant printed as such appendix the record in the case without permission of the court, and since, in the opinion of the court, the printing of a large part thereof was entirely unnecessary. See Rule 10, sec. 1.

Modified.