## RAYLITE ELECTRIC CORPORATION v. NOMA ELECTRIC CORPORATION
### (OTIS, intervener).
### No. 141, Docket 21528.

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 1950.

Decided Feb. 2, 1950.

Pennie, Edmonds, Morton & Barrows, New York City, attorneys for appellee, Louis Barnett, Daniel V. Mahoney, New York City, of Counsel.

Morris Kirschstein, New York City, for defendant.

Byerly, Townsend & Watson, New York City, attorneys for intervener-appellant, Robert W. Byerly, Ralph M. Watson, New York City, Roy H. Olson, Chicago, Ill., of Counsel.

Before AUGUSTUS N. HAND, CHASE, and FRANK, Circuit Judges.

---

CHASE, Circuit Judge.

The appellee, Raylite Electric Corporation, brought this suit for a declaratory judgment after being notified by Noma Electric Corporation that it was infringing United States Patent No. 2,383,941, granted to Carl W. Otis September 4, 1945, on his application filed January 28, 1942, and two other patents which had been granted to Otis, under all of which Noma was the exclusive licensee. Before judgment Otis intervened as a defendant. The controversy as to the other two patents was adjusted by the parties and the trial proceeded under appropriate pleadings as a suit for the infringement of the claims of Patent No. 2,383,941. After trial on the merits, claims 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 14 and 17 of this patent were held invalid for anticipation and claims 3, 6, 7, 8 and 9 were also held invalid for indefiniteness.[1] The original defendant then cancelled its license. The intervenor alone has appealed from that judgment.

The patent in suit, as the specifications state, "relates to ornamental illuminating devices" and "the invention is concerned with illuminating devices of the type wherein vapor bubbles ascend through a column of liquid.". A principal and successful commercial use, and one over which this controversy arose, has been in the manufacture of bubbling light bulbs for the decoration of Christmas trees. The construction of such light bulbs, or candles, according to the disclosure of the patent, has the advantage of simplicity, which gives low manufacturing cost, combined with satisfactory operation by use only of the small amount of heat obtainable from an electric lamp of low wattage. And by satisfactory operation is meant substantial certainty that bubbles will start flowing in the bulb without appreciable delay after the heat is applied and will do so in even progression until it dissipates, after being shut off.

Bubble motion in liquid sealed in a container was not new when Otis obtained the first of his patents. This was granted on September 26, 1939 and reissued on March 16, 1943 as Reissue No. 22,289. His second patent, No. 2,353,063, was granted on July 4, 1944 on his application filed November 6, 1941. Thus the reissue patent is to be treated as prior art though the second patent, because the application was copending with that of the patent in suit, is not. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F.2d 259; Clark Stek-O Corp. v. Carpenter-Hiatt Sales Co., 2 Cir., 55 F.2d 218. In the prior art also was Rosenblatt's Patent No. 2,278,383 which will be discussed later.

At this point some description of bubble movement in sealed containers may be helpful. The oldest method follows a principle the discovery of which is attributed to the genius of Benjamin Franklin. It utilizes a sealed glass tube having a bulb at each end. When partially filled with a suitable liquid the tube is tilted so that the lower bulb has a trapped bubble at the top. When heat is applied to the lower bulb, the liquid in it vaporizes into the trapped bubble and expands that until bubbles escape from it into the tube and rise to the surface. What thus happens in this and in all the later sealed tube bubble devices is vaporization followed by condensation, as in a distillation process, leaving the over-all amount of the liquid undiminished by use. As the generated bubbles escape into the entrapped bubble readily the bubbling can be started and maintained with a small amount of heat which consequently creates but a small rise in the temperature of the liquid in the lower bulb and makes a correspondingly small difference between the temperature of the heat in the body of the tube and that in the lower bulb.

It was known that if a tubular container from which the air had been substantially evacuated was partially filled only with liquid the liquid would tend to bubble whenever the temperature at the bottom was above the boiling point of the liquid and that at the top was lower so that a temperature differential existed between the bot-

1. However, the trial court stated in its opinion that "Otis and Noma rely upon claims Nos. 4, 12 and 14 of the suit patent to sustain the alleged infringement."

tom and the top. It was also known that vapor bubbles did not readily start upward through the liquid because of their tendency to form close to the container and apparently to cling there until sufficiently large to have the necessary buoyancy to break away. When the thus resisted break away occurred there was a sharp reaction called "bumping," with resulting uneven production and a more than wanted rapidity in the ascension of the vapor bubbles. Consequently various things were done by means of what were known as "starting" or "anti-bumping" devices to eliminate such tendencies. Among them were the roughening of the inside surface of the container or the placing in the bottom of a number of glass beads, or shot, or pebbles, or glass wool. It was thought that the small amount of air which adhered to the surface of these objects served to make the bubbles coalesce more easily and thus attain the size to float upward readily and evenly. According to this record there was, and now is, some speculation as to what makes such expedients work; yet it was established that they will, though not always with consistent efficiency. Of course, sufficient heating without more will bring about vaporization and make the bubbles rise but that does not obviate bumping or permit slow movement from the beginning. Moreover, vaporization, and the consequent desired bubbling, at least in an uninsulated container holding only the liquid, will not take place at all where the heat supply is too slight and consequently thermal circulation occurs, that is, where the liquid rises and the cool liquid descends so that all the liquid remains below the boiling point.

Such a situation as this just mentioned is brought about in a tube, containing only liquid and suitable in size as a Christmas tree bubbling candle, which is heated only by the electric light bulb that illuminates the candle, so far as this record shows. And it was to make bubbles rise certainly and attractively under these conditions that Otis experimented and produced the solution embodied in his disclosure in the patent in suit. It was in structure as the following quotation from his specifications shows: "This object of my invention is accomplished in general by providing a substance in the form of a coherent mass having a plurality of fissures running therethrough, the mass being adhered to the wall of the housing containing the liquid in the region where heat is applied." And what made it work is shown by this quotation from the specifications: "Since the liquid permeating the mass through the fissures is thus dispersed in very thin sheets, it tends to be maintained at substantially the temperature of the mass. When the source of heat is energized the temperature in the mass is raised and the stratified liquid, which in bubbling devices of this nature has a comparatively low boiling point, is almost immediately vaporized so as to quickly begin the generation of small bubbles. These bubbles are driven through the fissures and released from a surface of the mass remote from the surface thereof to which heat is applied."

A preferred way to do this, also as shown by the specifications, is simplicity itself. It is to put a rapidly vaporizing liquid, i. e., one with a low boiling point, such as wood alcohol, ether, or methylene chloride, either colored or not, into a tube previously prepared as follows: common table sugar, table salt, or borax in loose granular form is placed in the bottom of the tube with sufficient moisture for crystallization and then enough heat is applied to melt or fuse the material into a coherent mass. This is followed by cooling during which, as the specifications state, "a great number of fissures or cracks are developed throughout the body of the mass which has become self-adhered to the tube," but the fissures "are not sufficiently developed to cause the mass to lose its coherency and allow any portion thereof to break away from the mass." If Otis invented and disclosed anything which can give his patent validity, it is to be found in this fissured mass and its operation in the tube.

Before that he had disclosed in his reissue patent that bubble "starting" or "anti-bumping" could be accomplished by putting a hollow wooden plug into the bottom of the tube. He then said in his specifications that when heat was applied, "Because

of the pores in the wood adjacent to the glass wall of the tube, the liquid is quickly converted into a vaporous state," and also that "Large bubbles are formed within the bore of the plug." Thus, quick bubble starting was accomplished in this tube by the action of the heat upon the liquid confined in the pores of the wood "adjacent to the glass wall of the tube" and upon that enclosed in the bore of the plug but whether any liquid in the pores of the wood surrounding the bore of the plug was affected as was that in the pores of the outside of the plug was not mentioned. Presumably, however, the effect of heat would be the same in both places and perhaps that served to start the creation of the larger bubbles which emerged from the bore. However that may be, this patent disclosed the quick heating of a small amount of liquid which is isolated from the main body of liquid by what may be called the pore enclosure or the bore enclosure provided by the wooden plug.

But even if this reissue patent did not anticipate, Rosenblatt in his Patent No. 2,278,383, granted March 31, 1942, did. He wadded a small amount of glass wool into the bottom of his tube and secured thereby quick starting and even bubbling when sufficient heat was applied to raise the temperature at that end of the tube above the boiling point of the liquid. He said in his specifications that while the preferred material was fibrous like glass wool, "other materials may be used, such as shot, glass beads or the like, or other solid suspensoids may be employed to start the formation of the bubbles. The main requirement for the material is that it should contain a quantity of relatively small interstices, and thus be capable of entrapping and holding a relatively large bubble of vapor." One would suppose at first blush that this description of the "main requirement" of the bubble starter would point directly to, and include, the fissured mass of the patent in suit. The trial judge held that Rosenblatt anticipated the only novelty claimed for the patent in suit, but appellant makes an interesting argument to the contrary.

That argument is based on the fact that Rosenblatt said that what made his starter means work was a large bubble which formed in the liquid to enclose his starter. He designated his large bubble as "nuclear" and called the glass wool, or his equivalents of it, "nucleus-providing material," and said, "The retained bubble enclosing the nuclear material provides a start for the production and maintenance of the continuous stream of bubbles. Apparently the liquid adjacent to the retained vapor bubble enters the vapor space interiorly of the retained bubble and is vaporized in turn, the resulting excess of vapor breaking away to produce the stream of bubbles mentioned above. The nuclear material and its entrained [sic] vapor accordingly form a vapor chamber in which additional quantities of liquid become vaporized and which controls the evolution of the resulting bubbles as a smooth and evenly produced operation." He also said, "If the bubbles were free to rise as they are formed, as would be the case were the glass wool or other material omitted, they would simply rise through the liquid, and a completely new bubble would have to form in the liquid, requiring longer heat and producing only an intermittent bubbling effect in the liquid. Also, bubbles would be suddenly thrown up in the tube so that the localized heat of the bubble would be dispersed throughout the large mass of the liquid, which would have to become reheated to start again in the formation of the bubbles, the production of which would always be intermittent and likely to be accompanied by violent bumping."

So the appellant points out that Rosenblatt's theory as to the operation of his tube was so different from that which the appellant attributes to the patent in suit that he didn't anticipate because what is novel about the patent in suit, it is said, is "superheating." No reliance is put upon any entrapped bubble and it is assumed that there is none.

Appellant, however, has, in emphasizing the "nuclear bubble" language in Rosenblatt's specifications, lost sight of the fact that Rosenblatt recognized that what made the process of vaporization begin in his device was the rapid heating of the liquid

in close contact with the glass wool. As he said, when heat is applied "the liquid which permeates and contacts with the material is vaporized," or, again, "the liquid around the glass wool and within the interstices of the glass wool becomes vaporized very quickly." It is true that apparently he thought that that liquid's becoming vaporized formed a single large bubble which enclosed and was retained by the glass wool at the bottom of the tube and that this bubble facilitated the continuous formation of smaller bubbles which escaped through it to rise to the top. But however that may be, it is plain that appellant's "superheating" was the kind of heating that produced Rosenblatt's bubbles. In both, small portions of the liquid are substantially blocked off from the main body of it; these remain where they are quickly vaporized before diffusion of heat throughout the liquid, by way of thermal circulation, can occur; the blocking off is accomplished by the material of Rosenblatt containing his "relatively small interstices" and by the material of the patent in suit containing the numerous "fissures." What appellant calls "superheating" takes place when heat is added to Rosenblatt's tube and whether what he called a nuclear bubble forms or whether a number of retained bubbles form in the Rosenblatt tube may well be left, as this record leaves it, to conjecture. Cf. Diamond Rubber Co. v. Consol. Tire Co. of New York, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. One who knew that Rosenblatt's tube worked because the liquid was separated into small quantities in close contact with the material at the bottom of the tube and because of its situation vaporized quickly did not reach the status of an inventor in substituting for Rosenblatt's glass wool the "fissured mass" of Otis which blocked off small amounts of liquid in substantially the same way to get quick vaporization. Gardiner v. Hertz, 118 U.S. 180, 6 S.Ct. 1027, 30 L.Ed. 158; Kwik Set v. Welch Grape Juice Co., 2 Cir., 86 F.2d 945. And it is not even claimed that making that "fissured mass" by fusing and cooling in the way disclosed by Otis was itself invention. We agree with the trial judge that claims 2–9, 11, 12, 14 and 17 of the patent in suit were anticipated by the Rosenblatt patent and consequently find it unnecessary to decide whether any of them are also invalid for any other reason or, if valid, would be infringed by the Raylite tube.

Appellant argues, however, that at most only claims 4, 12 and 14 may be held invalid, inasmuch as the trial court said in its opinion that "Otis and Noma rely upon" those claims "to sustain the alleged infringement." The issues as framed by the pleadings, however, included the infringement, and therefore the validity, of all the claims held invalid. We take it that all that the trial court meant was that Otis and Noma relied principally upon claims 4, 12 and 14.

■ It follows that the judgment should not be limited to certain specified claims as was done in United States Galvanizing & Plating Equipment Corp. v. Hanson-Van Winkle-Munning Co., 4 Cir., 104 F.2d 856, but should be affirmed as entered below.

Judgment affirmed.