UNITED STATES v. BAUSCH & LOMB OPTICAL CO. et al.

District Court, S. D. New York.

May 27, 1942.

See, also, D.C. 34 F.Supp. 267.

Samuel S. Isseks, Sp. Asst. to the Atty. Gen., and Irving Glickfeld, John E. McCracken, and John S. James, Sp. Attys., all of New York City, for the government.

Simpson, Thacher & Bartlett, of New York City (Whitney N. Seymour and Francis X. Fallon, Jr., both of New York City, of counsel), for defendant Bausch & Lomb Optical Co. and others.

Lehrich & Lehrich, of New York City (Henry Lehrich, Benjamin S. Kirsh, and Hyman D. Lehrich, all of New York City, of counsel), for defendant Soft-Lite Lens Co., Inc., and others.

RIFKIND, District Judge.

This is a civil action by the United States under the provisions of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq. The two corporate defendants are Bausch & Lomb Optical Co., a manufacturer of opthalmic goods and Soft-Lite Lens Co., Inc., a distributor of unpatented, pink tinted lenses, under the trademark "Soft-Lite", for use in spectacles and eye glasses. The individual defendants are officers of one or the other corporation.

The complaint charges the defendants with violations of sections 1 and 3 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 3, by unlawfully contracting, combining and conspiring to restrain interstate trade and commerce in tinted lenses and, more particularly, by contracting, combining and conspiring: "(a) to designate and select according to certain arbitrary rules and regulations, wholesalers and retailers to handle, deal in, and sell certain tinted lenses known as Soft-Lite lenses; (b) to sell such tinted lenses only to such designated and selected wholesalers and retailers; (c) to restrain such wholesalers and retailers from selling to other wholesalers and retailers not so selected; (d) to force such wholesalers and retailers to observe certain arbitrary and unreasonable prices in reselling such tinted lenses; and (e) to limit the sale and distribution in interstate trade and commerce of tinted lenses similar to Soft-Lite lenses".

The complaint further charges that the defendants combined and conspired to es-

tablish and maintain a closely regulated scheme of manufacture and distribution by means of which the defendants would control completely all phases of the marketing of these unpatented tinted lenses, including the selection and designation of wholesalers and retailers of such lenses and the fixing and maintenance of minimum retail prices of such lenses; and that the object of this combination and conspiracy was effectively carried out by an exclusive manufacturing arrangement between Bausch & Lomb and Soft-Lite, by employing corporations affiliated with Bausch & Lomb to distribute approximately two-thirds of all Soft-Lite lenses, by price conferences and agreements, by a system of selecting wholesalers and licensing retailers and by requiring retailers to resell the lenses at the price prevailing in their respective localities.

As a result of the conspiracy and its effectuation, dealers who refuse to abide by the control exercised by defendants have been denied the right to deal in Soft-Lite lenses and consumers have been compelled to pay arbitrary and non-competitive prices.

The relief prayed for includes injunctions against the unlawful practices of the defendants, cancellation of the manufacturing agreement between Bausch & Lomb and Soft-Lite, cancellation and injunctions against the continuance of the distribution arrangements and licenses between Soft-Lite and its wholesalers and retailers.

The answers admit that Soft-Lite lenses move in interstate commerce, that they are manufactured by Bausch & Lomb exclusively for Soft-Lite, that defendant Soft-Lite licenses retailers to deal in Soft-Lite lenses. The answers deny substantially all the other material allegations and deny the violation of the Sherman Anti-Trust Act.

For several years prior to 1919, Morris Singer was purveying pink tinted lenses, for use in eye glasses, through several retail shops operated by him in the City of New York. These lenses were marketed under the trade-mark "Soft-Lite" owned by him. Soft-Lite lenses were ground for Morris Singer by several manufacturers out of pink tinted glass imported by him from France.

In 1919 Morris Singer and Nathaniel Singer, his son, formed Optical Service Corporation to engage in the wholesale distribution of Soft-Lite lenses. The name of Optical Service Corporation was in 1929 changed to Soft-Lite Lens Co., Inc., and it will hereinafter be so identified.

Tinted lenses had been sold in the market as far back as 1908. Pink tinted lenses, however, were apparently introduced into the American market by Morris Singer. They won public favor slowly and in 1924 Soft-Lite was still doing a very small business. At that time Nathaniel Singer estimated that the company's sales for the year would amount to about fifty thousand pairs.

On June 11, 1924, Bausch & Lomb entered into an arrangement to grind pink tinted lenses for Soft-Lite out of glass imported and provided by the latter. In connection with this arrangement and at the time it was made Bausch & Lomb was supplied by Soft-Lite with a list of its customers to whom Bausch & Lomb referred in an office memorandum as jobbers and retail licensees. Bausch & Lomb agreed that any orders for pink tinted lenses which it might receive it would transmit to Soft-Lite.

Shortly thereafter, in August, 1924, a change occurred in the relationship between the two companies. Bausch & Lomb became not only the grinder of Soft-Lite lenses but the exclusive manufacturer of the pink tinted glass from which the lenses were ground. Furthermore, it was understood that Bausch & Lomb would manufacture pink tinted glass only for Soft-Lite and that it would not compete with Soft-Lite in the sale of pink tinted lenses.

The parties have given this arrangement a more precise construction from time to time. Thus on September 13, 1926, Bausch & Lomb wrote to Soft-Lite as follows:

"Since the very beginning of our relations with you, in connection with this transaction, it has been understood that we would safeguard your interests in every way and it has never been our intention to make competition for you by either marketing a tinted lens of our own or producing similar tinted glass for other manufacturers and it is our intention to abide by this understanding.

"On the other hand, however, it is difficult to foresee the progress of science in producing glass possessing better properties than is obtainable at the present time and in that event we feel certain that you would not in any way desire to impede our progress in that direction.

"We hope that this may be sufficient guarantee to you that we do not wish to

do anything that would look like competition in connection with the Soft-Lite and we naturally expect that your efforts in the sale of same will be continued as at present for an indefinite period unless by consent of both parties concerned a different arrangement is agreed upon.

"Yours very truly

"Bausch & Lomb Optical Company

"P.S. Tinted lenses such as Crookes, Ficuzal, Smoke, Amber, etc. which we are now manufacturing it is understood will not come under the above arrangement".

This construction of the understanding of the parties was accepted by Soft-Lite.

The character of the basic relationship between the parties again came up for review in 1932 in connection with a patent application by Bausch & Lomb on Nokrome lenses. On July 6, 1932, Bausch & Lomb wrote to Soft-Lite, in part, as follows:

"Insofar as the marketing of product manufactured under this patent involves the use of Soft-Lite glass as such, we are willing to grant you the exclusive distribution under the same general conditions as we have agreed to in the letter written by our company to you under date of September 13, 1926".

Except for a change with respect to second quality lenses, the arrangements embraced in these communications have, in substance, governed the relation between the two corporations to this day. With respect to second quality lenses it was provided sometime between 1924 and 1935 that Soft-Lite would no longer be obliged to accept them; that Bausch & Lomb would not sell them in the United States but only abroad, in countries in which Soft-Lite had no offices, and at prices agreed to by both corporations.

These arrangements were developed through arm's length negotiations. Soft-Lite's object was to obtain from a highly regarded domestic source a product of uniformly good quality. Bausch & Lomb's object was to secure a prospectively increasing outlet for its manufactures.

These objects have been attained. The distribution of Soft-Lite lenses has grown rapidly. In 1938, Soft-Lite sold 447,171 pairs for $807,000; in 1939, 518,129 pairs for $910,000; in 1940, 563,113 pairs for $987,000.

Others have entered the pink tinted lens field. The most prominent are American Optical Company, Titmus Optical Company, Shuron Optical Company and Continental Optical Company. The aggregate sales of pink tinted lenses by the companies mentioned, including Soft-Lite, are as follows: 1938, 1,150,523 pairs for $1,598,179; 1939, 1,406,713½ pairs for $1,887,868; 1940, 1,433,583½ pairs for $1,939,502.

Pink tinted glass for lenses has been manufactured not only by Bausch & Lomb but also by Pittsburgh Plate Glass Company, which supplied the companies above-mentioned other than Soft-Lite, and by L. J. Houze Convex Glass Company.

Throughout the period mentioned there has been competition between untinted and tinted lenses, as well as in the various tints of lenses and among the distributors of pink tinted lenses.

Soft-Lite is engaged exclusively in selling. It does no manufacturing of any kind. The lenses it markets are purchased exclusively from Bausch & Lomb. Soft-Lite sells its lenses only to designated wholesalers. However, it promotes the sale of its lenses by appealing directly to retailers for patronage of its trademarked article.

Wholesalers designated by Soft-Lite to deal in Soft-Lite lenses may resell them only to retailers "licensed" by Soft-Lite. The form of "license" has undergone several changes.

Until 1927, there was no written form of license although retailers who dealt in Soft-Lite lenses were called licensees by Soft-Lite. Sometime in 1927, Soft-Lite established the practice of having the retailer, upon placing his first order with the wholesaler for Soft-Lite lenses, subscribe to a paper entitled, "Signed application for a Soft-Lite Licensee Privilege". The application was subject to acceptance by Soft-Lite. Therein the applicant declared that it was "a recognized high grade ethical optical concern", that it was cognizant of "the standards and principles upon which licenses for Soft-Lite are granted" and that it "subscribes to these principles". Between 1928 and 1933, a slightly revised form was employed which did not differ materially from the preceding one. Both forms of application called for endorsement or recommendation of the retailer by one of the designated wholesalers or by a Soft-Lite representative. It did not require the approval of Bausch & Lomb.

In May, 1933, was devised a plan of distribution which has, with one change,

prevailed to the present time. Two classes of retail licenses were established, one called a "stock license" issued to retailers who were equipped to perform certain finishing operations upon lenses; the other called a "prescription license" issued to retailers not so equipped.[1] There were different requirements as to minimum purchases and different price discounts applicable to the two licenses.

The license became a bilateral agreement between the retailer and Soft-Lite. In part it provided:

"1. Licensor hereby grants licensee a revocable, non-exclusive and non-transferable license to purchase said Soft-Lite lenses and lens blanks from a licensed Soft-Lite Distributor or Class 'A' Wholesale Licensee and to resell said lenses at prices prevailing in the locality in which licensee conducts his practice or business.

"2. Licensee agrees to use his best efforts to promote and further the use and sale of Soft-Lite lenses and further agrees to do nothing which may adversely affect the prestige of said lenses, agreeing not to sell or deal in any lens similar in tint, color or shade to Soft-Lite lenses. Said Soft-Lite lenses shall be sold only under the trade names and marks of the Licensor, and only to the patient or consumer. * * *

"5. Licensor may terminate this license at any time, by serving upon Licensee a written notice of thirty days. * * *"

In February, 1939, paragraph 2 of the license was changed to read thus:

"2. Licensee agrees to use his best efforts to promote and further the use and sale of Soft-Lite lenses and further agrees to do nothing which may adversely affect the prestige of said lenses; it being understood that the promotion of the sale of other lenses of a similar color, or the substitution of other lenses for Soft-Lite lenses, is detrimental to the good name and reputation of Soft-Lite lenses and may adversely affect the prestige thereof. Said Soft-Lite lenses shall be sold only under the trade names and marks of the Licensor and only to the patient or consumer."

This change was the result of a cease and desist order issued by the Federal Trade Commission.

Upon the issuance of a license to a retailer the designated wholesalers were notified that they were at liberty to sell to him.

Bausch & Lomb also manufactured patented lenses with specified characteristics under the names Orthogon and Panoptik. These lenses were manufactured both in pink tinted glass and other glass. A number of reciprocal arrangements prevailed between the two corporations arising out of this overlapping. Thus Orthogon licensees of Bausch & Lomb were privileged to purchase Orthogon Soft-Lites. Soft-Lite stock licensees were privileged to buy uncut Orthogon Soft-Lites. Orthogon "Franchise Dealers" were automatically listed as Soft-Lite prescription licensees. Panoptik licensees could buy Panoptik Soft-Lites. Soft-Lite licensees could not deal in Panoptik bifocals unless licensed by Panoptik.

Soft-Lites are distributed by seven thousand to eight thousand licensed retailers in the United States. The total number of oculists and optometrists in the United States is thirty thousand, of whom about one-half are active purchasers of lenses.

There is no doubt that Soft-Lite exerted every effort to keep the stream of its lenses well within defined channels which it established, reaching from the source of manufacture to the ultimate consumer. It selected only those wholesalers who were willing to cooperate with its policy. It licensed only those retailers who agreed to and observed its policy.

Excluded from its wholesale customers were those who did business with "unethical retailers"; wholesale branches of the American Optical Company; and wholesalers whose volume was relatively small. Excluded from the retailer list were those who failed to maintain the price prevailing in the locality; "indulged in installment advertising where prices are quoted in any form"; maintained their establishments in a department store or jewelry house; did not conduct their business or practice in a "reputable and ethical manner".

In its advertising Soft-Lite stressed that it was protecting its licensed retailers from the competition of unethical practitioners and price cutters.

Soft-Lite's policy was enforced: by scrutiny before the retailer was licensed; by surveillance through Soft-Lite's salesmen and by cancellation of the retailer's

---

[1] The classification of retailers into stock retailers and prescription retailers is one commonly recognized in the trade with varying qualifying characteristics.

license if he failed to abide by Soft-Lite's policy. Upon cancellation, wholesalers were notified in writing that the retailer was no longer entitled to receive Soft-Lite lenses. Wholesalers observed this exclusion.

As an additional device for the enforcement of its policy, and especially to create the appearance of enforceability, Soft-Lite used a "protection certificate". Each pair of Soft-Lite lenses was accompanied by a numbered certificate which vouched for the genuineness of the lenses and disclosed, by means of the number, the wholesale source of the lens. The testimony is to the effect that the protection certificate was but rarely used to trace the wholesale source of lenses found in the hands of unlicensed retailers. It is clear, however, that it could be used for that purpose and that wholesalers were informed that it was intended for that purpose.

It is undisputed that Soft-Lite designated to the wholesalers the prices to be received by them from the retailers. This was done by means of published price lists. These lists were made available to retailers as well as to wholesalers and the retailers were thus informed of the prices at which they could expect to purchase Soft-Lite lenses from the wholesalers. Nathaniel Singer, President of Soft-Lite, testified that these price lists were intended only as suggestions. If so, they were suggestions which the wholesalers regarded as obligatory. Both Soft-Lite and the wholesalers understood that material deviation would result in the discontinuance of business. Soft-Lite's advertising, price lists and conduct, as well as Nathaniel Singer's speeches at trade meetings, confirmed this understanding.

■ There is much deeper conflict in the testimony as to whether Soft-Lite fixed the price to be charged by retailers to consumers. It is admitted that such prices were fixed on "goggles" (glasses which filter out some light but otherwise leave vision unaffected). Defendants contend that this was a solitary instance, long since abandoned, and insignificant in volume. I find that Soft-Lite did not establish a uniform retailer-consumer price on Soft-Lite lenses. That does not mean that consumer prices were freely allowed to find their competitive levels. A number of regulatory forces were exerted by Soft-Lite and its wholesalers which operated on consumer prices.

The first of these was the retailers' agreement to sell at "prices prevailing in the locality". The second was Soft-Lite's insistence that its lenses be sold at a premium over comparable untinted lenses. Departure from these two standards was punished by revocation of license. Restoration followed only upon adequate assurance of compliant behavior in the future. By these means, Soft-Lite was assuring the trade that it was protecting the retailers' legitimate profit. Soft-Lite's salesmen and representatives were instructed to and did observe whether Soft-Lite policies were carried out by wholesalers and retailers. Where suspicion was aroused by the complaint of one retailer against another, "shopping" was engaged in by agents of Soft-Lite to ascertain whether there was non-compliance with the price regulations.

Was the Soft-Lite system of distribution independently maintained or did Bausch & Lomb play a role in maintaining it? This question is complicated by the contention of the plaintiff that the Bausch & Lomb affiliates were in fact one with Bausch & Lomb, or at least instrumentalities of Bausch & Lomb so that their acts may be ascribed to it. The affiliates are six wholesale distributors of opthalmic goods. Over a period of years, after 1924, Bausch & Lomb acquired the controlling stock interest in each of them. The six wholesale houses operate, in the aggregate, 164 branches. They constitute, by far, the largest outlet for Soft-Lite lenses, accounting for sixty percent of the sales.

It was stipulated, for purposes of this trial only and for no other purpose and subject to conditions stated in the stipulation, that "Bausch & Lomb, through its ownership of a majority of the outstanding voting stock of each said wholesale companies, has power to coordinate and control the sales and pricing policies of said wholesale companies".

Whatever may be the legal relationship between Bausch & Lomb and its affiliates, the business relationship is quite clear. Manifestly, Bausch & Lomb is vitally interested in the price which Soft-Lite charges to wholesalers since the Bausch & Lomb affiliates constitute the most prominent group among Soft-Lite's wholesale customers. It is equally clear that Bausch & Lomb is concerned with the price level of the lens to the consumer. The logic of its concern was well expressed in 1925 by

Sterling, an officer of Bausch & Lomb, in an inter-office memorandum:

"The economic justification for the existence of Soft-Lite in the picture has always been that they start with high retail prices and from this develop a price schedule that leaves an attractive profit at every link in the chain of distribution, including the very sizeable mark-up in price between our sales price to Soft-Lite at the factory and our purchase price paid to Soft-Lite at distribution. If the retailers are not able to obtain the high prices listed, this becomes a matter of vital concern to us * * *".

I do not accept this as proof of the existence of a "list" of prices to be charged by retailers, as Sterling's explanation of the use of that word is adequate. I do take it as evidence that Bausch & Lomb was consciously aware of the business logic of its relations with Soft-Lite.

We come, therefore, to the next question, which is, whether this concern of Bausch & Lomb with prices charged to wholesalers, retailers and consumers was translated into agreement with Soft-Lite or in action taken in concert with Soft-Lite.

The evidence clearly supports the conclusion that price was frequently the subject of discussion between Soft-Lite and Bausch & Lomb. These discussions related to every segment of the price structure. Whenever Bausch & Lomb reduced its price to Soft-Lite it insisted that the reduction be transmitted down along the chain of distribution; and in every instance but one Soft-Lite complied. It is equally clear that the affiliated corporations charged retailers the price designated for that purpose by Soft-Lite; that they cooperated in weeding out so-called undesirable retailers; and that some of them participated in discussions with Soft-Lite concerning the rather complicated Soft-Lite price schedules before they were published or revised.

It is equally clear from the evidence that prior to the acquisition of control by Bausch & Lomb the wholesalers, now identified as affiliates, were similarly helpful and, indeed, that non-affiliated wholesalers were likewise cooperative in the effectuation of Soft-Lite's policy.

The relationship between Bausch & Lomb and Soft-Lite was a cordial one. There were many points of cooperative contact. Lists of wholesale customers were exchanged. "Tips" with respect to the quality of dealers were given by one to the other. When there was doubt about a customer there was discussion between Bausch & Lomb and Soft-Lite and an exchange of experience in relation to that customer.

Likewise with respect to a number of items distributed in the optical trade for advertising purposes rather than for profit there was very considerable cooperation, including agreement on price. This applied to cleaning cloths, a "dispenso box", or receptacle for cleaning cloths, and lens cabinets.

Bausch & Lomb scrupulously refrained from competing with Soft-Lite in pink tinted lenses. In 1936, however, Bausch & Lomb, over Soft-Lite's protest, introduced "Ray Ban", a green tinted lens, which it marketed directly without the aid of Soft-Lite. Similarly, Soft-Lite sold its lenses to wholesalers who were in active competition with the affiliated wholesalers; and the affiliated wholesalers, as well as the non-affiliated wholesalers, sold lenses which were competitive with Soft-Lites.

In an effort to tie Bausch & Lomb more securely to Soft-Lite's system of distribution the plaintiff offered the testimony of one Wahlgren, whose credibility the defendants have vigorously attacked. While there is a wide divergence between Wahlgren's version of the origin of the 1924 agreement and Nathaniel Singer's, there is no serious conflict with respect to the truly material items. I do not accept the contention that in 1924 Bausch & Lomb and Soft-Lite envisioned in detail the 1933 distribution system. On the other hand, the logic of Soft-Lite's status in the lens business made the discussion of price between Bausch & Lomb and Soft-Lite imperative. And this was true even before Bausch & Lomb had acquired affiliates who were Soft-Lite's chief customers. Soft-Lite constituted an additional link in the chain of distribution inserted between the manufacturer and the wholesaler. If its profits were not to be obtained at the expense of the manufacturer or of the manufacturer's customers, it must be derived from a higher price charged to the consumer. A premium price to the consumer above untinted lenses was, therefore, the sine qua non of Soft-Lite's existence, and Soft-Lite's ability to market its lenses at such a premium price was the only justification of the exclusive agreement made with it by Bausch & Lomb.

■ The evidence does not justify an inference that in 1924 or at any time thereafter Bausch & Lomb undertook to assist Soft-Lite to attain such a goal, except as the exclusive manufacturing agreement itself may be so regarded. The inference is, however, inescapable that before Bausch & Lomb granted Soft-Lite an exclusive manufacturing arrangement it was satisfied that Soft-Lite would so market the product as to justify that arrangement.

Nathaniel Singer testified that the necessary price conditions were achieved by superior salesmanship, resourcefulness, advertising and by building a "halo" about Soft-Lite lenses. Undoubtedly these contributed. I find, however, that the "halo" was no more than the glitter of high price, artificially maintained by a framework of agreements in restraint of trade.

These were designed to confer upon Soft-Lite the power to control the price of its lenses at every stage of distribution down to consumer. They were effective instruments for the accomplishment of that purpose and were successfully used to attain it.

The mischief of these agreements becomes more conspicuous when examined in the light of the established trade practice that the retail purveyor of the lenses is frequently the one who also "prescribes" for the patient-customer. Into his quasi professional judgment is thus introduced the knowledge that he can prescribe a lens whereon his profit is greater; and this temptation is more easily yielded to when there is security against competitive comparison. That security Soft-Lite, by its advertising, salesmanship and by public addresses at trade meetings undertook to provide for those who dealt in its products. The paucity of complaints and the relative rarity of punitive action against violators of the ethics preached by Soft-Lite attest the success of its efforts.

■ The principle has long been established that the Sherman Act condemns an agreement between a distributor and a group of wholesalers to boycott all retailers not approved by the distributor and to charge a uniform price to all retailers who are approved. Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; United States v. A. Schrader's Son, Inc., 1920, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; Federal Trade Commission v. Beech Nut Packing Co., 1922, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Eastern States Retail Lumber Dealers' Association v. United States, 1914, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R. A. 1915A, 788; Binderup v. Pathé Exchange, Inc., 1923, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Anderson v. Shipowners' Association, 1926, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298; Paramount Famous Corp. v. United States, 1930, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; United States v. First National Pictures, Inc., 1930, 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151.

■■ Obviously, trade is restrained by the distribution system of Soft-Lite. Nor need we be concerned to inquire whether the restraint is unreasonable, Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734, since price fixing is illegal per se. United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Socony-Vacuum Oil Co., Inc., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

In the latter case the court said (at page 218 of 310 U.S., at page 842 of 60 S.Ct. 84 L.Ed. 1129):

"Thus for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. And we re-affirm that well-established rule in clear and unequivocal terms in Ethyl Gasoline Corp. v. United States, 309 U.S. 436 [458], 60 S.Ct. 618, 626, 84 L.Ed. 852, where we said:

" 'Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition, United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, and agreements which create potential power for such price maintenance exhibited by its actual exertion for that purpose are in themselves unlawful restraints within the meaning of the Sherman Act, * * *.' "

It does not matter whether the market in the commodity involved is or is not dominated by the parties to the agreement. United States v. Socony-Vacuum Oil Co., Inc., supra, 310 U.S. at page 225, 60 S.Ct. 811, 84 L.Ed. 1129; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 485, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. It matters not that the price is not uniform. United States v. Socony-Vacuum Oil Co., Inc., supra, 310 U.S. at page 222, 60 S.Ct. 811, 84 L.Ed. 1129. And these authorities have established that the law is not mollified by the circumstance that under the operation of the agreements the sale of the commodity has increased and competition by those outside the conspiracy stimulated. United States v. Patten, 1913, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325. The agreement is not saved by the circumstance that as part thereof some very desirable ends are served, such as the exclusion of dishonest merchants from access to the commodity. Ethyl Gasoline Corp. v. United States, supra; United States v. Masonite Corporation, 62 S.Ct. 1070, 86 L.Ed. ——, decided May 11, 1942.

True, there is no written agreement here between the distributor and the wholesalers as there was in Dr. Miles Medical Co. v. John D. Park & Son's Co., supra. That, however, does not immunize the distribution system devised by Soft-Lite. Neither was there a written agreement in Federal Trade Commission v. Beech Nut Packing Co., supra, but that did not avail. The agreement is implicit in the operation of the system. The living reality of uniform prices from wholesalers to retailers, corresponding to the written instructions of the distributor, of wholesalers' refusal to sell to unlicensed retailers, of surveillance of wholesalers by means of protection certificates and over retailers by "shopping", compel the conclusion that between the wholesalers and the distributor there was agreement or at least acquiescence in a program of concerted action. Surely, it would not mitigate the offense if adherence to the plan were involuntarily exacted. Loewe v. Lawlor, 1908, 208 U.S. 274, 293, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Eastern States Retail Lumber Dealers' Ass'n v. United States, 1914, 234 U.S. 600, 611, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A. 1915A, 783.

Defendants call the favored retailers "licensees". When admitted to the privilege of purchasing Soft-Lite lenses they received from Soft-Lite a document called a license. But Soft-Lite has no privilege to confer. The right to buy Soft-Lites from those who own them is not within its gift. The trademark does not give Soft-Lite any such power to project its control over the trademarked article. This has been held with respect to a patent. Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. A fortiori it applies to a trademark. Without the boycott maintained by it, in concert with the wholesalers, against unlicensed retailers, Soft-Lite's attempt to exercise this pretended power would have been a mere theatrical gesture. The force which transferred the license from the stage to the market place was the force of the boycott. And it is this very exertion of force by agreement or combination against the freedom of trade which is outlawed by the Sherman Act.

In defending this system of controlled distribution defendants rely chiefly on United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A. L.R. 443. That case affirmed the right of a manufacturer or trader to choose his customers and to define in advance the conditions upon which trade with them would be conducted. The limited significance of that case has been stated by the Supreme Court itself in the Beech Nut case, 257 U.S. 441, 452, 42 S.Ct. 150, 154, 66 L.Ed. 307, 19 A.L.R. 882, where the court said:

"In the subsequent case of United States v. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471, this Court had occasion to deal with a case under the Criminal Appeals Act [18 U.S.C.A. § 1704], wherein there was a charge that a manufacturer sold to manufacturers in several states under an agreement to observe certain resale prices fixed by the vendor— which we held to be a violation of the Sherman Anti-Trust Act. In referring to the Colgate case we said: 'The court below misapprehended the meaning and effect of the opinion and judgment in that cause. We had no intention to overrule or modify the doctrine of Dr. Miles Medical Co. v. [John D.] Park & Sons Co., where the effort was to destroy the dealers' independent discretion through restrictive agree-

ments. Under the interpretation adopted by the trial court and necessarily accepted by us, the indictment failed to charge that Colgate & Company made agreements, either express or implied, which undertook to obligate vendees to observe specified resale prices; and it was treated as alleging only recognition of the manufacturer's undoubted right to specify resale prices and refuse to deal with anyone who failed to maintain the same.' * * *

"By these decisions it is settled that in prosecutions under the Sherman Act a trader is not guilty of violating its terms who simply refuses to sell to others, and he may withhold his goods from those who will not sell them at the prices which he fixes for their resale. He may not, consistently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade."

█ Nor can there be any doubt that the written agreement or licenses between Soft-Lite and the retailers are violative of § 1 of the Sherman Act. It is sufficient to point to the promise exacted from the retailer to sell at prices "prevailing in the locality". The only defense which can be suggested is that the retail trade is intrastate in character. But the defense is insufficient. As has already been pointed out, the elimination of retail competition and the maintenance of a high retail price was the keystone of the arch of controlled distribution erected by Soft-Lite. It is a crucial part of a system involving interstate commerce.

Montague & Co. v. Lowry, 1904, 193 U.S. 38, 45, 24 S.Ct. 307, 309, 48 L.Ed. 608. There the court adverted to such a defense in the following language:

"It is urged that the sale of unset tile, provided for in the seventh section of the by-laws, is a transaction wholly within the state of California and is not in any event a violation of the act of Congress which applies only to commerce between the states. The provision as to this sale is but a part of the agreement, and it is so united with the rest as to be incapable of separation without at the same time altering the general purpose of the agreement. The whole agreement is to be construed as one piece, in which the manufacturers are parties as well as the San Francisco dealers, and the refusal to sell on the part of the manufac-

turers is connected with and a part of the scheme which includes the enhancement of the price of the unset tile by the San Francisco dealers. The whole thing is so bound together that when looked at as a whole the sale of unset tile ceases to be a mere transaction in the state of California, and becomes part of a purpose which, when carried out, amounts to and is a contract or combination in restraint of interstate trade or commerce." See, also, Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 484, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

█ It is suggested that only controls of the price structure as between competitive business units are violative of the law, whereas the controls in the case at bar are not between competitive units. But the suggestion is not admissible. In United States v. Patten, 1913, 226 U.S. 525, 541, 33 S.Ct. 141, 144, 57 L.Ed. 333, 44 L.R.A.,N.S., 325, the court said:

"Section 1 of the act [15 U.S.C.A. § 1], upon which the counts are founded, is not confined to voluntary restraints, as where persons engaged in interstate trade or commerce agree to suppress competition among themselves, but includes as well involuntary restraints; as where persons not so engaged conspire to compel action by others, or to create artificial conditions, which necessarily impede or burden the due course of such trade or commerce, or restrict the common liberty to engage therein." See, also, Patterson v. United States, 6 Cir., 1915, 222 F. 599, 618, certiorari denied 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499.

The suggestion cannot be accepted for another reason. Here we have in fact an agreement among the wholesalers through Soft-Lite and an agreement among the retailers through Soft-Lite. Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; United States v. The Masonite Corporation, 62 S. Ct. 1070, 86 L.Ed. ——, decided May 11, 1942. Each participant, of course, understands that he is part of a larger system.

In the light of the doctrine so clearly announced by the Supreme Court it cannot be doubted that the distribution system for Soft-Lite lenses defies both the letter and spirit of § 1 of the Sherman Act.

The plaintiff urges that the relief to be granted herein should not be limited to striking down the system of distribution from Soft-Lite through wholesalers to retailers and consumers. It contends that the manu-

facturing arrangement between Bausch & Lomb and Soft-Lite should likewise be condemned. Two arguments are advanced in support of this contention: 1. That the arrangement is violative of law, independently of the distribution system; 2. that it is contaminated by the vice of the distribution system, of which it forms a part.

Is the manufacturing arrangement alone condemned by the Sherman Act? There is no lawyer-drawn instrument which in precise terms defines the arrangement under consideration. We have a Bausch & Lomb memorandum of July 30, 1924, containing the words: "It is understood that we make the above Soft-Lite glass for them only. It is also understood that this arrangement is made between us and the Optical Service Corporation of New York only".

We have the correspondence to which reference has already been made in the statement of facts. And, finally, we have the course of conduct of the parties over a period of sixteen years. In actual operation the understanding of the parties was that Bausch & Lomb was the exclusive manufacturer of pink tinted glass and grinder of Soft-Lite lenses therefrom and that Bausch & Lomb abstained from marketing a pink tinted lens or manufacturing pink tinted glass for other lens grinders.

■ In a lay sense, the withdrawal of Bausch & Lomb from competition with Soft-Lite in the distribution of pink tinted lenses, and its refusal ·to sell pink tinted glass to competitors of Soft-Lite pursuant to arrangement, is a restraint of trade. But certainly ever since Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, it has been established that the lay conception was inadequate to express the legal conception and that the law was violated only by unreasonable restraints.

In determining whether a restraint is unreasonable the guidance of the classic opinion in United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, is still available. It is too well known to require quotation here. The standards there set forth appear in substantially similar form in the Restatement of the Law of Contracts of the American Law Institute, §§ 515, 516. § 516 reads as follows:

"§ 516. Instances of Reasonable Restraints.

"The following bargains do not impose unreasonable restraint of trade unless effecting, or forming part of a plan to effect, a monopoly: (a) A bargain by the transferor of property or of a business not to compete with the buyer in such a way as to injure the value of the property or the business sold;

"(b) A bargain by the buyer or lessee of property or of a business not to use it in competition with or to the injury of the seller or lessor;

"(c) A bargain to enter into partnership with an actual or possible competitor;

"(d) A bargain by a partner not to interfere by competition or otherwise with the business of the partnership while it continues, or subject to reasonable limitations after his retirement;

"(e) A bargain to deal exclusively with another;

"(f) A bargain by an assistant, servant, or agent not to compete with his employer, or principal, during the term of the employment or agency, or thereafter, within such territory and during such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent".

In the Addyston case the Circuit Court quoted with approval from Horner v. Graves, 7 Bing. 735, the following (page 282 of 85 F., 46 L.R.A. 122): "We do not see how a better test can be applied to the question whether this is or not a reasonable restraint of trade than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. * * *"

And the court continued, "This very statement of the rule implies that the contract must be one in which there is a main purpose, to which the covenant in restraint of trade is merely ancillary."

In the case at bar the main purpose of the contract is to provide a source of supply for Soft-Lite. The restraining covenant is for the protection of the purchaser who is spending large sums to develop his good will and enlarge the public patronage of a relatively new article of commerce. The arrangement, though not a partnership in legal form, is functionally a joint enterprise in which one will produce and the other market the commodity. United States v.

Addyston Pipe & Steel Co., supra, 85 F. at page 281.

It is clearly a "bargain to deal exclusively with another", Restatement, supra, § 516.

■ It is not necessary to find and I do not find that Soft-Lite's specifications for the glass constituted a secret formula for the protection of which a restraining covenant would be proper. There is nothing contrary to public policy in the arrangement. Nothing in the evidence indicates that Bausch & Lomb enjoyed a monopoly in the manufacture of glass for lenses, whether pink or otherwise. On the contrary, the evidence is clear that other manufacturers of lenses have had access to pink glass from other sources and that the success of Soft-Lite has stimulated emulation and competition. See Federal Trade Commission v. Raymond Bros.-Clark Co., 1924, 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448, 30 A.L.R. 1114.

I conclude that the exclusive arrangement between Bausch & Lomb and Soft-Lite taken independently of the distribution system is not violative of the Sherman Act.

Should that arrangement nevertheless be stricken down as part of the unlawful distribution system? United States v. Patten, 1913, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; United States v. Reading Co., 1912, 226 U.S. 324, 33 S.Ct. 90, 57 L.Ed. 243; Swift & Co. v. United States, 1905, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518.

■ It is urged that this basic agreement resulted in the active cooperation of Bausch & Lomb affiliates in the unlawful distribution scheme; that it provided the setting for subsidiary illegal agreements such as those relating to cleaner-cloths, dispenso boxes and lens cabinets. Unquestionably, it brought the two corporations close together. But the law does not require hostility even between acknowledged competitors. Maple Flooring Manufacturers Ass'n v. United States, 1925, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093.

■ The surer test is whether it is necessary to eliminate the valid agreement in order successfully to eradicate the unlawful combination. Reference has already been made to the crucial part which the high consumer price on Soft-Lite lenses played in the logic underlying the arrangement between Bausch & Lomb and Soft-Lite. It may well be that the amputation of the distribution system would cause the manufacturing arrangement to atrophy. There is nothing in the manufacturing arrangement which compels its continuance beyond the point when it is mutually beneficial to both parties. But it is not the court's function to speculate on such an outcome. Soft-Lite may perhaps discover a lawful halo for its product. It may be aided by recourse to legal resale price maintenance agreements under the Miller-Tydings Amendment, 15 U.S.C.A. § 1. Weighing the several considerations involved, I conclude that the balance of advantage lies in permitting the manufacturing arrangement, properly insulated against the unlawful distribution system, to survive.

Since 1940, Soft-Lite has entered into resale price maintenance contracts with a number of wholesalers, fixing minimum resale prices of Soft-Lite lenses to be sold by them. The complaint does not count on these resale price maintenance agreements as acts done in violation of the Sherman Act. If the agreements are invalid implementations of the Miller-Tydings Amendment they would, of course, constitute in themselves violations of the Sherman Act. The answers do not affirmatively plead the agreements made under the Miller-Tydings Amendment as sanctioning the conduct of the defendants in whole or in part.

However, proof with respect to them has been received, consisting of the text of the agreements and a list of the wholesalers who have entered into them with Soft-Lite. The issue has been argued both orally and in the briefs.

These agreements are not subject to the defect exposed in United States v. Univis Lens Co., May 11, 1942, 62 S.Ct. 1088, 86 L.Ed. ——. They suffer, however, from the circumstance that they came into existence as a patch upon an illegal system of distribution of which they have become an integral part. It has already been found herein that the system devised by Soft-Lite created not only a perpendicular system of control but, in addition, two horizontal systems, one involving competing wholesalers and the other competing retailers.

■ Such horizontal agreements are not sanctioned by the Miller-Tydings Amendment. In United States v. The Masonite Corp. supra, [62 S.Ct. 1078, 86 L.Ed. ——] the court said: "It should be noted in this connection that the Miller-Tydings Act, 50 Stat. 693 * * * which amended § 1 of the Sherman Act so as to legalize certain types of resale price agreements expressly ex-

400

cluded 'any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other'".

See, also, Rayess v. Lane Drug Co., 1941, 138 Ohio St. 401, 35 N.E.2d 447; Frank Fischer Merchandising Corp. v. Ritz Drug Co., 1941, 129 N.J.Eq. 105, 19 A.2d 454.

The facts herein do not permit the treatment of the resale price maintenance agreements as isolated transactions separate and apart from the scheme of controlled distribution as a whole. They have become part of a system of horizontal agreements and, as such, do not enjoy the protection of the Miller-Tydings Act.

Plaintiff is, therefore, entitled to a decree cancelling such contracts and enjoining the system of distribution employed by Soft-Lite, including the arrangements with wholesalers and retailers and cancelling the licenses outstanding between Soft-Lite and retailers and enjoining the continuance of the licensing system.