**AMERICAN POTATO DRYERS, Inc., et al. v. PETERS.**

No. 6051.

United States Court of Appeals
Fourth Circuit.

Argued June 13, 1950.

Decided Sept. 13, 1950.

Gordon W. Daisley, Washington, D. C., and Oscar Leach, Raleigh, N. C. (Smith, Leach & Anderson, Raleigh, N. C., on the brief), for appellants and cross-appellees.

Charles F. Meroni, Chicago, Ill. (Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., Clem B. Holding and Bailey & Holding, all of Raleigh, N. C. on the brief), for appellee and cross-appellant.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

These are cross appeals in a patent case. The plaintiff in the court below was Frederick C. Peters, holder of Arthur patents Nos. 2,228,192 and 2,326,115, relating respectively to a process for drying potatoes for shipment and a machine for carrying out the process. Plaintiff asked damages for infringement of the patents and for breach of confidence and breach of contract by defendants with respect to the subject matter which they embrace. Defendants are Broadus Wilson and American Potato Dryers, Inc., a corporation which he controls. In addition to denying liability to plaintiff, defendants alleged that plaintiff had been guilty of violating the anti-trust acts in connection with his ownership of the patents and asked damages on that account. The judge below made extensive findings of fact in which he held that the patents sued on were invalid, that

even if valid, they had not been infringed, that defendants were not estopped to deny their validity, and that there was no basis for recovery by plaintiff on account of breach of confidence or breach of contract or by defendants on account of the alleged violations of the anti-trust acts. From judgment entered on these findings both sides have appealed; but plaintiff raises no question as to the correctness of the holding as to the invalidity of the machine patent.

While many matters have been discussed in the briefs and arguments of counsel, the case before us, when properly analyzed, is narrowed to three questions: (1) whether, the process patent sued on is valid; (2) whether because of dealings had between the parties, defendants are estopped to question the validity of the patent or plaintiff is entitled, irrespective of its validity, to recover damages of defendants because of breach of confidence or breach of contract; and (3) whether defendants are entitled to recover damages of plaintiff on account of violations of the anti-trust laws. We think that all of these questions should be answered in the negative.

1. The Validity of the Patent.

The patent in suit, No. 2,228,192, issued to A. F. Arthur and assigned to plaintiff, was applied for March 29, 1940, and granted January 7, 1941. It relates to the washing of dirt from potatoes and drying them by the use of a current of hot air. To wash potatoes before they are shipped to market adds to their value, but the moisture which clings to them after they are washed is conducive to soft rot or decay. It is important, therefore, that, if the potatoes are washed, they be dried afterwards; and the process of the patent is to dry them by passing them through a tunnel in which they come in contact with hot air flowing in the opposite direction. It is contended that this process results not only in drying the potatoes but also in producing a biological change which further protects them from decay. Claims one and five, which may be taken as typical, are as follows:

"1. The process of treating potatoes for shipment and to aid in preventing

soft rot during shipment which comprises moistening whole potatoes so that the skin of each potato is covered with a film of moisture adapted to serve during subsequent steps of the process as a heat insulator to prevent cooking of the body of the potato, then conveying the moistened potatoes through a confined area, subjecting the potatoes as they travel through said area to a heated blast of air for a period of time approximating four minutes and of a temperature of substantially 100 to 145 degrees F. and of a velocity of substantially 1200 feet per minute to evaporate the moisture from the skins of the potatoes by skin drying the potatoes and whereby substantially one-half pound of moisture is removed from each bushel of potatoes, and utilizing the evaporation of said moisture to preclude the heating and cooking of the body of the potato."

"5. In a process of treating raw potatoes to aid in preventing deterioration while preserving the natural appearance of the potatoes, the steps of disposing the potatoes in a predefined area and subjecting each potato uniformly over its entire surface to a large volume of heated relatively high velocity air of a temperature approximately 100 degrees F. for a short period of time sufficient to remove rapidly moisture from the outer and periderm layers of cells of the potato, and just prior to discharge of the potato from said area causing the dried outer cells of the potato to be subjected to a higher temperature short of that which would cook the starchy body of the potato but which will cause a biological change in the formation of the outer and periderm layers of cells of the potato to render the same resistant to the ingress of deteriorating bacteria."

The patent is correctly analyzed in the findings of the learned judge below as follows: "The only acts or physical operations actually performed on the potatoes in carrying out the process disclosed in patent No. 192 are as follows: (1) moistening or washing whole potatoes so that the skin of each potato is covered with a film of moisture, (2) conveying the moistened potatoes through an enclosed drying chamber, (3) subjecting the potatoes as they travel through the chamber to a blast of heated air moving in the opposite direction to that of the potatoes, the air having (a) a temperature of approximately 145 degrees F. upon entry into the chamber and an exit temperature of about 100 degrees F., and (b) a linear velocity of approximately 1200 feet per minute, and (4) keeping the potatoes in the chamber for a period of approximately four minutes. The specification of patent No. 192 also describes, and the claims include, certain other alleged features of the process, such as: (A) evaporating the moisture from the skins of the potatoes by skin-drying the potatoes and thereby removing substantially one-half pound of moisture from each bushel of potatoes, (B) utilizing the evaporation of said moisture to preclude the heating and cooking of the starchy body of the potatoes, and (C) causing the heat of the heated air to act on the outer layers of cells of the potatoes as they are drying to cause a biological change or a change of cell construction or formation therein such as to render the potatoes resistant to the ingress of soft rot bacteria. The weight of the evidence is contrary to the teaching of patent No. 192 that the drying procedure specifically described therein is effective to cause such a biological or other change in the outer layers of cells of the potatoes as they are dried."

We would not be justified, on the evidence before us, in reversing the finding of the lower court with respect to the biological change produced in the potatoes by the process of the patent; but we regard this as immaterial, in any event, since the biological change produced in the potatoes, if any there be, is the result of the process and not a part thereof and is therefore not patentable. Le Roy v. Tatham, 14 How. 156, 174-175, 14 L.Ed. 367. The process of the patent, then, is nothing more than using hot air to dry potatoes being carried on a conveyor in a tunnel, and we agree with the court below that no patentable novelty was involved in such a process. The evidence shows beyond question the use of heated air for drying potatoes, which had been washed in preparation for marketing, as early as 1930 by the

Idaho Packing Co. at Pocatello, Idaho. While the specific details of the process at Pocatello are not shown in evidence, the evidence does show that a process which is substantially the process of the patent was in use by John F. Stambaugh at McGuffey, Ohio, in 1934 and by the Gould's Growers, Inc. of Goulds, Florida, in 1937. Goulds, Florida, is the town in which it is claimed that the process of the patent was developed; and the evidence shows that more than a year before the patentee claims to have reduced his ideas to practice, the process for which his patent was issued was being publicly used in the town in which he was operating. With respect to the Stambaugh and Goulds uses of the process, the trial court found the facts as follows:

"11. The testimony and exhibits concerning the Stambaugh dryer establish that at least as early as 1936 Stambaugh publicly practiced a process of treating potatoes, for shipment which included the steps (1) washing the potatoes, (2) conveying them through an enclosed tunnel for a distance of 110 feet, (3) blowing air of relatively high temperature through the tunnel countercurrent to the movement of the potatoes by means of a fan having an output velocity of 1800 feet per minute, and (4) subjecting the potatoes to the heated air for a period of approximately 4½ minutes, and that, under normal weather conditions, the potatoes thus treated were satisfactorily dried, had no visible moisture on them, and were well enough dried to enable their packing in paper bags. In view of the non-critical character of the specific values of air temperature and velocity and time of treatment of the potatoes set forth in the claims of patent No. 192, and since the alleged production of a biological or other change in the outer layers of cells of the potatoes, if it occurs under the conditions specified in the claims, would inherently occur in any equivalent procedure, the method of operation of the Stambaugh dryer embodied every material procedural step of the process claimed in patent No. 192.

"12. Early in 1937 Goulds Growers, Inc., of Goulds, Florida, began to publicly use in their commercial packing operations two potato processing production lines each of which included a washing mechanism and a heated air dryer, the method of operation of which was the same in all material respects as the process defined by the claims of patent No. 192. The Goulds Growers packing-house was located only one-quarter of a mile away from plaintiff's packing-house where Arthur was employed, and Arthur was admittedly very familiar with the construction and method of operation of the Goulds Growers installation from the time when it was being built. * *

"15. The Goulds Growers Potato washing and drying machines as they were publicly used during the potato packing seasons of 1937 and 1938 performed the following operations in preparing potatoes for shipment: (1) washed the potatoes, (2) conveyed them through enclosed tunnels for a distance of approximately 100 feet, and for double that distance during time of unfavorable weather conditions, (3) produced a high velocity, turbulent flow of heated air through the tunnels countercurrent to the movement of the potatoes there through, the air having an inlet temperature of from 120 to 150 degrees F. and being blown through the tunnels by fans having an output velocity of approximately 880 feet per minute, and (4) subjected the potatoes to the heated air for a period of time ranging from 3½ to 5½ minutes, or double that period when both machines were connected in series. The potatoes discharged from the Goulds Growers dryers were dried sufficiently to practically eliminate losses from bacterial soft rot, which is the avowed purpose of the process of patent No. 192."

▮▮▮ In the light of these findings, which are amply supported by the testimony, the process patent is clearly invalid. As we have seen, the pointing out in the patent that the process of drying by hot air resulted in a biological change in the potatoes did not constitute patentable invention. And it is equally clear that it was not invention to point out the range of temperature and the velocity of the air current at which the best results were to be obtained. There was nothing critical in any particular tem-

perature or velocity; and the determination of which had best be used involved nothing that the skill of the engineer could not easily supply. The fact that Arthur may have made improvements in a process already being used successfully did not entitle him to a patent where there was nothing in the improvements involving real invention as distinguished from the skill of the calling. See Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 27 L.Ed. 438; Thompson v. American Tobacco Co., 4 Cir., 174 F.2d 773, 777; Wine Ry. Appliance Co. v. B. & O. R. Co., 4 Cir., 78 F.2d 312, 319, and cases there cited.

It is difficult to see, at this time in the history of the arts and sciences, how it could possibly be thought that there was patentability in the use of hot air in drying vegetables; and the process of blowing the air through a tunnel in a direction opposite to that in which the vegetables are being carried would seem to be a process which would readily suggest itself to anyone faced with the problem. That machines employing such a process had long been known, is shown by numerous patents referred to by the lower court in holding the machine patent invalid. See findings 34, 35 and 36. A patent may not, of course, be granted for a process when the process has been disclosed by prior patents covering machines to practice the process. MacDougald Const. Co. v. Finley, 5 Cir., 38 F.2d 809, certiorari denied 282 U.S. 862, 51 S.Ct. 36, 75 L.Ed 763; Girdler Corp. v. Abbotts Dairies, D. C., 24 F.Supp. 551, affirmed 3 Cir., 106 F. 2d 998.

Since the patent is manifestly void on account of the prior uses established by the evidence, it is not necessary that we consider the Wayland patent also relied upon by the lower court, nor is it necessary that we pass upon the questions of infringement which have been strenuously argued.

2. The Dealings Between the Parties.

Plaintiff contends that, even though the patent sued on be invalid, defendants are estopped to assert its invalidity because of dealings had between the parties. They contend also that these dealings establish a confidential relationship which defendants have abused, entitling plaintiff to recover damages on that account, and that plaintiff is entitled to recover damages also because defendants have breached the provisions of a contract entered into between the parties at the conclusion of their dealings. The facts established with respect to these matters are as follows:

Plaintiff, a grower and shipper of potatoes, employed Arthur, the grantee of the patents in suit, as a packing house foreman and assigned him the duty of working out some satisfactory process of cleaning potatoes for shipment. Arthur, after experimenting with a cooling or refrigerating process for handling the washed potatoes, decided that a more satisfactory process would be to dry them by the use of hot air and proceeded to have a machine built for that purpose. A part of the equipment for this machine was furnished by one of defendant Wilson's corporations; and one Hincz, representing the corporation, helped to install it and became thoroughly familiar with the machine and its operation. He told defendant Wilson about the machine and brought him to plaintiff's packing house where Wilson saw it in operation and discussed with plaintiff the possibility of obtaining a patent on it. This was early in the year 1939. Defendant made no effort then to obtain a patent either for himself or for plaintiff but began planning to manufacture potato drying machines which would use the hot air process. In early 1940 plaintiff and defendant entered into three contracts the salient provisions of which were that a corporation should be organized, owned in equal parts by plaintiff and defendant, to manufacture and lease potato drying machines; that one of defendant's corporations should be given the exclusive contract of manufacturing the machines; and that the patents which were to be applied for should be the property of a corporation owned by plaintiff but that the corporation to be formed should be granted a license to use them for a nominal consideration. Arthur had already made application for the patent in suit, and the corporation provided for in the contracts was duly organized and commenced business. A con-

troversy arose within a few months, however, and defendant sold out to plaintiff his interest in the corporation. The three prior contracts were then cancelled and a new contract was thereafter made, dated August 31, 1940, settling all matters in difference between the parties. That contract contained, among others, the following provisions:

"4. That for and in consideration of payments made in the past to said parties of the first part (Wilson and one of his corporations) said parties of the first part, together and separately, agree not to utilize or to take advantage in any way of disclosures to them by the said parties of the second and third parts of the latter's processes and apparatuses for processing agricultural products, which is the basis of a patent application now pending in the Patent Office and owned by said parties of the second part.

"5. That the parties of the first part, except as provided for in the present agreement, hereby agree not to use any of the confidential disclosures to them regarding said process of treating agricultural products by said parties of the second part, and not to manufacture, sell, or lease any equipment for processing agricultural products in accordance with the process disclosed to them in confidence by said parties of the second and third parts."

Following the execution of this contract, defendant began making and leasing potato drying machines which plaintiff contends practice the process of the Arthur Patent but which defendants contend operate upon entirely different principles.

■ We see no ground upon which the defendants can be held to be estopped to assert the invalidity of the patent. They were never licensees under it; they neither bought nor sold any interest in it; and they entered into no contract recognizing its validity in any way. Not even the corporation formed by plaintiff and defendant to manufacture and lease potato drying machines held any license under the patent but had at the most a mere executory contract that it should have a license under any patent that might be obtained, and the final contract between the parties put an end even to this. Under such circumstances, it is perfectly clear that defendants are not estopped to dispute the validity of the patent by reason of having sold out to plaintiff their interest in the corporation which was to have potato drying machines manufactured and lease them.

■ And we think it equally clear that no factual basis has been established for recovering damages on account of breach of confidence under the principles laid down in Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912 or Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587. We agree with the following finding of the court below with respect to this matter: "49. None of the information which the defendant Wilson obtained concerning the things upon which plaintiff relies as secrets was given to Wilson in confidence by either the plaintiff or Arthur. The defendant Wilson had been fully informed by Hincz concerning the construction and operating procedure of the plaintiff's installation before Wilson ever visited plaintiff's packinghouse. The information which Hincz thus conveyed to Wilson was obtained by Hincz by fair means, in the ordinary and open course of business, and without any injunction of secrecy; he had free access to the plaintiff's dryers at all times and rightfully considered that all of the information connected therewith, particularly the technical data which he himself worked out in designing the air conditioning equipment, could be freely given by him to Wilson or anyone else. The weight of the evidence does not support plaintiff's contention that his brief conversation with the defendant Wilson on the subject of patents during Wilson's first visit to plaintiff's packinghouse in February 1939 gave rise to a confidential relationship between the two men, nor does it establish that Wilson obtained on that visit any information with respect to the installation in the packinghouse which he did not already have. The evidence likewise fails to establish plaintiff's contention that the defendant Wilson received secret or confidential information from Arthur with respect to the potato processing installations made by General Pro-

172

duce Dryers, Inc., using the dryers which had been designed and built under Wilson's supervision at the General Air Conditioning Company plant at Raleigh."

■ For the same reason, no basis is established for recovery on the theory that the above quoted provisions of the final contract between the parties have been breached. While plaintiff complains that defendants' machines embody his process, he does not specifically point out the disclosures or processes which he contends that defendants have appropriated. As we have seen, the process and machine of plaintiff embodied processes and devices which were old and well known in the art and which had been employed in practically the same way by Goulds only a few hundred yards from plaintiff's installation. The provisions of the contract which we have quoted cannot reasonably be interpreted as an agreement by defendants not to use machines or processes in use by persons other than plaintiff; for it would be absurd to designate as a confidential disclosure that which is publicly known. It is not sufficient, therefore, for plaintiff to introduce general testimony to the effect that Arthur had the idea of drying potatoes by the use of hot air and that defendants were given the benefit of his ideas while helping to build his machine. Plaintiff must show that he disclosed to defendants matters which were peculiar to the process and machine which he was developing, and not common property, and that defendants used these in building their machine, and not merely devices and processes which were open to the public. This he has not done. As was well said in the findings of the court below: "62. Paragraph 5 of the August 31, 1940 agreement is specifically limited by its terms to the use of 'confidential' disclosures. Although paragraph 4 does not include the word 'confidential' as a modifier of 'disclosures', the word 'disclosures' itself implies that the things referred to were secret, concealed or unknown prior to the time of their revelation. The evidence does not establish that any confidential disclosures were made to the defendant Wilson by plaintiff or on his behalf."

The evidence, in fact, negatives the making of any confidential disclosures. The deposition of the witness Arthur relating to the matter tells of the visit of Wilson to plaintiff's packing plant and his meeting with Peters, and proceeds as follows: "They talked a little bit there, and Mr. Wilson seemed especially pleased with the installation; in fact, I would almost describe his expression as beaming. He said, 'Mr. Peters, you really have got a wonderful thing here, and I believe it can be patented.' They talked a few minutes, longer, and Mr. Peters was pleased with that statement, and informed Mr. Wilson that he was extremely busy selling potatoes, and that he would like to have me show him further details of the machine. I talked with Mr. Wilson and Mr. Hincz, explaining the operations, but Mr. Wilson was pretty well acquainted with them. He seemed to know all about the entire installation. We did not spend a great deal of time there, since he seemed to know, without my explaining it, how it operated and particularly how the drying operation was handled. I brought him in here to Mr. Peters' office then, and left them with Mr. Peters. I didn't see them when they left, because I had to go back into the packinghouse and continue operations.

"Q. 293. How did you happen to explain the operations to Mr. Wilson and Mr. Hincz? A. Because Mr. Wilson told Mr. Peters he could get him a patent, or thought he could get him a patent, and Mr. Peters asked me to show him everything about it, to give him access to it and give him the information.

"Q. 294. Did you do that? A. I gave him what I could in the time we had, but he seemed to know as much about it as I did. I didn't think it was necessary to give him any great deal of information."

This testimony clearly indicates that no confidential disclosures had been made prior to that time and that none was made then because, in the language of Arthur, Wilson "seemed to know all about the entire installation".

It is strenuously argued that confidential disclosures to defendants are conclusively established by the fact that the above quoted

provisions were inserted in the contract. Wilson contends, however, that Peters, who had the contract prepared, had these provisions incorporated without prior agreement; that there were in fact no confidential disclosures to which they could have had reference; and that he signed the contract without insisting upon their deletion because Peters was away on a cruise and could not be reached and only by executing the contract could he get money which Peters owed him and which he needed. Be that as it may, it is clear that the provisions of the contract do not of themselves make out a case for damages for breach of contract. It is necessary that plaintiff supplement them by specific proof of what confidential disclosures he made to defendants and what damage he has sustained by reason of defendants' use thereof. No such damage from breach of the contract has been established.

### 3. Violation of Anti-Trust Law.

Defendants' counterclaim for damages under the anti-trust acts is based (1) on contracts between plaintiff and the Food Machinery Corporation to the effect that that company, which was contracting to manufacture machines for plaintiff under his patent, would not manufacture, lease or sell any potato-drying machinery competitive with that of the patent, and (2) on threats by plaintiff to bring infringement suits against the licensees of defendants' machines. No extended discussion of these matters is necessary. Defendants have shown no damage resulting to them from the contracts between plaintiff and the Food Machinery Corporation; and for this reason, even if the contracts were violative of the anti-trust acts, which we do not decide, see United States v. Bausch & Lomb Optical Co., D.C., 45 F.Supp. 387, 399; Id., 321 U.S. 707, 719, 64 S.Ct. 805, 88 L.Ed. 1024, they would furnish defendants no basis for recovery. So far as the threats of suit for patent infringement are concerned, the evidence supports the finding of the lower court that these were made in good faith in protection of what plaintiff thought were rights secured by the patent and not pursuant to an unlawful attempt to extend the monopoly thereby granted. See U. S. G & P. E. Corp. v. Hanson-Van Winkle, etc., Co., 4 Cir., 104 F.2d 856, 862.

For the reasons stated, the judgment appealed from will be affirmed.

Affirmed.